IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| TRIANGLE EXPERIENCE GROUP, INC. | Case No. 1:23-cv-01797-MSN-LRV |
| Plaintiff, | Honorable Judge Michael S. Nachmanoff |
| v. | JURY TRIAL DEMANDED |
| MAX MINDS, LLC, | |
| Defendant. | |

## DEFENDANT MAX MINDS, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, OR ALTERNATIVELY, TO TRANSFER VENUE

Defendant Max Minds, LLC ("MAX") respectfully submits this brief, together with the accompanying Declaration of Brandon Fischer, attached herewith as **Exhibit A** (hereinafter, the "Fischer Declaration" or "Fischer Decl.") and exhibits thereto, in support of its motion to dismiss the above captioned action (the "Action") against plaintiff Triangle Experience Group, Inc. ("TEG") pursuant to Rule 12(b)(2) or 12(b)(3), or in the alternative, to transfer the Action to the United States District Court for the Southern District of Indiana, Indianapolis Division, pursuant to either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a).

### INTRODUCTION

This Action should not have been commenced in Virginia. First, the courts in Virginia lack personal jurisdiction over MAX, an Indiana-based software company that creates highly functional software platforms for commercial and governmental applications. MAX does not have the sufficient minimum contacts with Virginia to provide the Court with jurisdiction required under the Due Process Clause of the Fourteenth Amendment. For many of the same reasons, venue is improper in this Court as well.

Significantly, even if the Court determines that jurisdiction and venue are proper, the Court should transfer the case to the forum that the Parties repeatedly agreed upon. When parties contractually agree to a venue, especially an exclusive venue, well-settled precedent treats that decision as the parties exercising "venue privileges" before a dispute arises. And if one of the parties then sues in a different venue—one the parties did not agree to—that party bears the burden of showing why the case should not be transferred to the agreed-upon venue. If that party cannot meet the burden, the case should be transferred to the agreed-upon venue.

At its core, this Action is a dispute over the ownership of certain software MAX created and developed. TEG specifically seeks a Declaratory Judgment that it and MAX own the software "50/50." But TEG and MAX previously entered into multiple contracts that specifically address the ownership and further require litigation relating to or arising out of those contracts to be brought in Indiana, where MAX is organized and based.

More specifically, MAX and TEG worked together to distribute one of MAX's products, "Haptic Federal," to customers in the federal government. This was initially established in a Joint Venture Agreement (the "JVA"), attached to the Complaint (Dkt. 1) as Exhibit 1. Notably, the JVA does not address the crux of this case—ownership of MAX's underlying software—*and* the JVA does not contain a forum/venue selection clause. However, two separate agreements—the End User License Agreement ("EULA") and the Source Code License Agreement ("SCLA")—do state that MAX has full ownership of all its software and do specify that the exclusive venue to resolve disputes is Indiana. The EULA and SCLA are attached herewith as **Exhibit B** and **Exhibit C**, respectively.

Transferring this case to Indiana is further warranted in the interests of judicial economy and minimizing the risk of inconsistent rulings. Subject to the resolution of this Motion, MAX

intends to file a complaint (in form and substance of the draft attached herewith as **Exhibit D**) in the Southern District of Indiana—where the Parties agreed to litigate. For all of these reasons, MAX respectfully requests the entire Action be dismissed or transferred.

## FACTUAL BACKGROUND

Brandon Fischer is a software technologist and entrepreneur who lives in Carmel, Indiana. Fischer Decl., ¶ 2. He founded MAX in May 2018 initially an as an entity through which he could perform some consulting work with his prior employer. *Id.* at ¶ 6. MAX eventually began developing the software product "Haptic" and brought it to market by July 2019. *Id.*

Fischer met employees of TEG when he worked for his prior employer before MAX. *Id.* at ¶ 7. In approximately March 2018, shortly after he left his prior employer, TEG contacted Fischer to discuss potentially working together on a project. Fischer declined and continued with his work at MAX independently. *Id*. At all times relevant to the actions in this case, Fischer was living and working in Indiana. *Id.* at ¶ 2.

In July 2019, MAX, having been contacted a year earlier by TEG, invited TEG to a nearby demonstration of its Haptic product. *Id*. at ¶ 8. TEG declined the invitation and instead invited MAX to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia, to TEG and leaders within the Joint Staff Lab, *i.e.*, potential customers, which MAX did. *Id*.

Because MAX had already created Haptic by this point (and had already sold a license for Haptic to a government agency in August 2019), MAX instituted an End User License Agreement in December 2019 that accompanies every Haptic installation, which would subsequently also be used for every branch of Haptic. *Id*. at ¶¶ 8, 10. The EULA squarely addresses the issue of ownership: "**All title, ownership rights and intellectual property rights in and to the Product**

3

[the Haptic application, software, their associated upgrades, patches, and updates and related services (the 'Product') currently provided or which will be provided by **Max Minds, LLC dba Haptic**] . . . and any and all copies thereof **are owned by HAPTIC or its licensors**. . . . **This License confers no title or ownership in the Product and should not be construed as a sale of any rights in the Product.**" Ex. B, § 2 (emphasis added). Further, the EULA disclaims any warranties, including the warranty of implied fitness for a particular purpose, and places the responsibility for proper testing and appropriate use on the user. Ex. B, § 5.

Any person installing the software must read and accept the terms of the EULA before proceeding, as shown in a screenshot of the installer application prompt, attached herewith as **Exhibit 1 to Fischer Declaration**. Fischer Decl., ¶ 11. TEG has agreed to the EULA numerous times to install and/or access the software. *Id*. at ¶ 12. Moreover, TEG's CEO Rob Clare read and acknowledged the EULA in an email on August 10, 2020 attached herewith as **Exhibit 2 to Fischer Declaration**. Fischer Decl., ¶ 11.

In November 2019, TEG contacted MAX to discuss how TEG could become an authorized distributor of the Haptic software to the U.S. Government. *Id*. at ¶ 9. TEG requested a meeting and Fischer met with TEG in Virginia later that month. *Id*. TEG then requested that Fischer and another MAX employee visit TEG in January 2020 and offered to pay for MAX's entire trip including expenses, which MAX accepted. *Id*. These were the only instances MAX recalls meeting with TEG in Virginia other than the July demonstration. *Id*.

On January 23, 2020, MAX and TEG entered into the Joint Venture Agreement. *Id*. at ¶ 13. Pursuant to the JVA, MAX was to "create and maintain a branch of the Haptic source code, called Haptic Federal," while TEG would be the "exclusive distributor/reseller of the Haptic Federal product into the federal market" and be responsible for "establish[ing] and manag[ing] all

4

federal channel sales partnerships." (Compl., Ex. 1, at 1-3, Dkt. 1.) The JVA only pertains to Haptic Federal, not Haptic or any other branch of Haptic. Both Haptic (now called Alleo) and Haptic Federal evolved independently in parallel.

The JVA did not address ownership of Haptic Federal.[1] Rather, MAX and TEG reiterated MAX's ownership rights to Haptic Federal in the Source Code License Agreement, which comports with MAX's ownership rights under the EULA. In the SCLA, TEG "acknowledges that, as between [TEG and MAX], MAX owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation."[2] Ex. C, § 7(a). Further, the SCLA disclaims any warranties, including the warranty of implied fitness for a particular purpose, and places the responsibility for proper testing and appropriate use on the user, just as in the EULA. Ex. C, § 8.

The crux of TEG's claims is Count I—seeking a declaratory judgment that TEG and MAX own the Haptic software (and all branches) "50/50." Indeed, MAX has recently learned that it appears TEG has a 5-year $49.5 million sole-source contract that runs from 2022-2027, which TEG never disclosed to MAX and which TEG cannot hope to fulfill without purporting to own

---

[1] The only part of the JVA that hypothetically addresses ownership of intellectual property states that "[a]ny Intellectual Property ('IP') resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX[,]" but TEG never paid MAX for any "custom software development" so there was no co-owned IP. (Compl., Ex. 1, at 2, Dkt. 1.)

[2] The SCLA defines the following terms related to intellectual property on page 1:
- "Software" means [Haptic Federal On-Premise Version], including any Updates provided to Licensee pursuant to this Agreement.
- "Source Code" means the source code for the Software and any and all information and materials concerning the source code that Licensor delivers or discloses to Licensee and all updates of the source code.
- "Documentation" means Licensor's user manuals, handbooks, and installation guides relating to the Software provided by Licensor to Licensee either electronically or in hard copy form.

5

MAX's intellectual property. Fischer Decl., ¶ 14. TEG cannot escape that the ownership of MAX's intellectual property is governed by the EULA and SCLA. Both of those agreements demonstrate that TEG's claims of ownership should be rejected as a matter of law, but before that (and more pertinent to this Motion) they also demonstrate and require that this dispute should be resolved in Indiana.

## ARGUMENT

I. **MAX Does Not Have Minimum Contacts With Virginia for Personal Jurisdiction.**

  A. **Rule 12(b)(2) – Dismissal or Transfer Due to Lack of Personal Jurisdiction**

"Federal Rule of Civil Procedure 12(b)(2) permits dismissal of an action when the court lacks personal jurisdiction over the parties." *Yancey v. Int'l Fid. Ins. Co.*, No. 1:16-CV-0057, 2016 WL 2997375, at *2 (E.D. Va. May 25, 2016). "If personal jurisdiction is lacking, the court may dismiss or transfer the case pursuant to 28 U.S.C. § 1406(a)." *Id*.

"To demonstrate personal jurisdiction over a defendant consistent with the Due Process Clause, a plaintiff must show (1) a State's general jurisdiction over the defendant by demonstrating the defendant's continuous and systematic contact with the State;[3] (2) a State's specific jurisdiction over the defendant by demonstrating that the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts; or (3) Rule 4(k)(2) jurisdiction by demonstrating that no State can exercise personal jurisdiction over the defendant and that the defendant has sufficient contacts with the United States such that exercising jurisdiction over the defendant would be consistent with the

---

[3] MAX does not anticipate that TEG will argue there is general jurisdiction over MAX in Virginia. *KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15CV432 JCC/JFA, 2015 WL 6506308, at *4 (E.D. Va. Oct. 27, 2015) ("Absent exceptional circumstances, the defendant is only subject to the general jurisdiction of the forum state if it is the defendant's domicile.").

U.S. Constitution and laws."[4] *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198 (4th Cir. 2018) (citations omitted).

"To demonstrate the contacts necessary under the Due Process Clause for the district court to exercise personal jurisdiction over [Defendant MAX], [Plaintiff TEG is] required to demonstrate (1) that [MAX] purposefully availed itself of the privilege of conducting activities in Virginia; (2) that [TEG's] claims arose out of the activities that [MAX] directed at Virginia; and (3) that the district court's exercise of personal jurisdiction over [MAX] would be constitutionally reasonable." *Id*. "[I]n cases where the defendant provides evidence which denies facts essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Benton v. Home Max Realty, Inc.*, No. 3:23CV311 (RCY), 2024 WL 346490, at *1 (E.D. Va. Jan. 30, 2024) (citations and quotation marks omitted).

### B. Rule 12(b)(2) Warrants Dismissal Because There Is No Personal Jurisdiction Over MAX.

TEG's complaint fails to establish that MAX is subject to personal jurisdiction in Virginia. "In determining whether a defendant has purposely availed itself of the privilege of conducting business in a State, [the Fourth Circuit has] identified numerous nonexclusive factors to be considered, such as (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the

---

[4] Rule 4(k)(2) is inapplicable here where TEG has only brought state law claims. Fed. R. Civ. P. 4(k)(2)("For a claim that arises under federal law . . .").

7

business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted." *Sneha Media & Ent., LLC*, 911 F.3d at 198–99.

The balance of the foregoing factors weighs heavily against jurisdiction:

(1) MAX has never maintained an office or agents in Virginia. Fischer Decl., ¶ 4.

(2) MAX has never maintained property in Virginia. *Id*. at ¶ 5. Rather, MAX maintains its intellectual property at its principal place of business in Carmel, Indiana. *Id*.

(3) MAX has not reached into Virginia to solicit or initiate business with TEG. It was TEG who initiated contact with Fischer, who lives in Indiana, in March 2018 about working together. *Id*. at ¶¶ 2, 7. When Fischer, MAX's CEO, conducted a demonstration of Haptic for TEG and others at the Joint Staff Lab in Norfolk in July 2019, it was at TEG's request. *Id*. at ¶ 8. Similarly, TEG requested a meeting with MAX in November 2019 to discuss how TEG could become an authorized distributor of the Haptic software to the U.S. Government, and MAX met with TEG later that month. *Id*. at ¶ 9. In January 2020, MAX visited TEG at TEG's request, with TEG even paying for MAX's entire trip and expenses. *Id*. At all times MAX was developing its software in Indiana. *Id*. at ¶ 5.

(4) MAX has not engaged in significant business activities within the state. Rather, MAX contracted with TEG—which happens to be incorporated in Virginia—to create a distribution channel for MAX's Haptic Federal product to the U.S. Government. Notably, it is MAX's understanding that nearly all TEG staff (other than its CEO and CFO) live and work in states other than Virginia and that, on most days, TEG's Virginia office does not have many (if any) employees working there. *Id*. at ¶ 15.

(5) The two contracts relevant to ownership of MAX's software—the EULA and SCLA—are governed by Indiana law, not Virginia law. Ex. B, § 9.4.1; Ex. C, § 12(f). Notably, the JVA and the Parties' Non-Disclosure Agreement (the "NDA") do not contain a choice of law provision. (Compl., Ex. 1, Dkt. 1; Compl., Ex. 2, Dkt. 1.)

(6) MAX made minimal contact with TEG in Virginia, most or all at TEG's request. As noted above, MAX's CEO met with TEG in Virginia twice in 2019 and once in 2020, at TEG's request. Fischer Decl., ¶¶ 8-9. These were the only instances MAX met with TEG in Virginia. *Id*. at ¶ 9. In all, MAX traveled to Virginia and met with TEG just three times over a six-month span, and MAX has not traveled to Virginia to meet with TEG in the four years since then. *Id*.

(7) The primary contracts—the JVA, EULA, and SCLA—did not require MAX to perform in Virginia.

(8) The nature of the business being transacted was that MAX would create and maintain a software program in Indiana that TEG would then distribute to federal government customers—nothing about the nature of this arrangement hinged on MAX performing activities within Virginia (and, as noted above, it is MAX's understanding that much of TEG's activities are also performed by employees outside of Virginia). *See Sneha Media & Ent., LLC*, 911 F.3d at 199 ("At bottom, we conclude that these facts purportedly connecting Associated Broadcasting with Virginia are simply insufficient to satisfy due process requirements. Associated Broadcasting carries on its business solely in India, and, by a contract executed in India, it gave Nord the right to distribute its TV9 programming elsewhere.").

"Careful consideration of the record in this case compels the conclusion that the Defendant did not purposefully avail itself of the privilege of conducting activities in the Commonwealth of Virginia." *Delta-T Corp. v. Harris Thermal Transfer Prod., Inc.*, No. CIV.A.3:09CV321-HEH,

2009 WL 2877151, at *4 (E.D. Va. Sept. 4, 2009). This Court's analysis "must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state." *Id*. (citing *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 n.4 (4th Cir. 2009)). "The Court [should take] particular note that the Plaintiff initiated the contact with the Defendant, the contract was to be performed outside of Virginia, and the contract[s] [were] governed by [Indiana] law." *Delta-T Corp.*, No. CIV.A.3:09CV321-HEH, 2009 WL 2877151, at *4. "Defendant's contacts, alleged by Plaintiff, demonstrate minimal relation to the Commonwealth of Virginia and are clearly insufficient to warrant a finding of personal jurisdiction." *Id*.

## II. Virginia Is an Improper Venue in Which to Adjudicate This Action.

### A. Rule 12(b)(3) – Dismissal or Transfer Due to Improper Venue

"Federal Rule of Civil Procedure 12(b)(3) permits a defendant to challenge the plaintiff's choice of venue." *Yancey*, No. 1:16-CV-0057, 2016 WL 2997375, at *2. "The plaintiff bears the burden of establishing that venue is proper." *Id*. "The Court is permitted to consider evidence outside the pleadings in determining whether venue is proper, and it will view the facts in the light most favorable to the plaintiff." *Benton*, No. 3:23CV311 (RCY), 2024 WL 346490, at *2 (citations and quotation marks omitted). "If venue is improper, the court may dismiss the case or exercise its discretion to transfer pursuant to 28 U.S.C. § 1406(a)." *Yancey*, No. 1:16-CV-0057, 2016 WL 2997375, at *2.

The rules governing venue are set forth in 28 U.S.C. § 1391(b), which provides as follows: "A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action

may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

"Residency" of a company for venue purposes is determined based on 28 U.S.C. § 1391(c)(2), which provides that: "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; . . ."

### B. Rule 12(b)(3) Warrants Dismissal Because None of the Factors to Establish Venue are Present Here.

None of the avenues to satisfy the venue statute 28 U.S.C. § 1391(b) are present here. MAX does not "reside" in Virginia for venue purposes because MAX is not subject to personal jurisdiction in Virginia. 28 U.S.C. § 1391(b)(1); 28 U.S.C. § 1391(c)(2). Even taking TEG's complaint at face value, the events or omissions giving rise to TEG's claims all occurred outside Virginia. 28 U.S.C. § 1391(b)(2). TEG is accusing MAX of failing to comply with the JVA and an NDA—all of which would have occurred at MAX's place of business in Carmel, Indiana. (Compl., ¶¶ 63-76, Dkt. 1); Fischer Decl., ¶ 3. Further, the property that is the subject of the Action is not situated in Virginia. (Compl., ¶¶ 63-76, Dkt. 1); Fischer Decl., ¶ 5.

Significantly, TEG's assertions do establish that there is a proper venue and forum, namely the Southern District of Indiana, Indianapolis Division, which is the applicable federal court for Carmel, Indiana where MAX is located. It is clear that a substantial part of the alleged events or omissions giving rise to TEG's claims occurred at MAX's place of business. (*See, e.g.*, Compl. ¶¶ 5, 28-29, 33-34, 45, 47-49, 56, 58, 60-62, Dkt. 1); *see generally* Ex. D. Additionally, the property that is the subject of the Action is MAX's software (Haptic and Haptic Federal), which is situated

at MAX's place of business in Indiana. Fischer Decl., ¶ 5; *Benton*, No. 3:23CV311 (RCY), 2024 WL 346490, at *4 (venue improper in the Eastern District of Virginia). Further, because there is another District where venue is proper, and MAX is not subject to personal jurisdiction in Virginia, the "catch-all provision" of 28 U.S.C. § 1391(b)(3) is not applicable either. *Id*.

### III. Because Virginia Is an Inconvenient Forum, the Court Should Transfer the Action to Indiana Where the Parties Agreed Disputes Will Be Resolved.

#### A. 28 U.S.C. § 1404(a) – Transfer to a Convenient Forum

"Even if personal jurisdiction and venue are proper, the court may transfer pursuant to 28 U.S.C. § 1404(a)." *Yancey*, No. 1:16-CV-0057, 2016 WL 2997375, at *3. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

Parties often consent to specific districts when they agree to forum-selection clauses. *See Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western District of Texas*, 571 U.S. 49, 63 (2013) (noting that a contract containing a valid forum-selection clause represents the "parties' agreement as to the most proper forum"). A valid forum/venue selection clause changes the 28 U.S.C. §1404(a) analysis in three ways: "[f]irst, the plaintiff's choice of forum merits no weight [and] as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted[;]" second, arguments regarding the parties' private interests are not relevant; and third, the original forum's choice-of-law rules no longer apply. *Atlantic Marine*, 571 U.S. at 63-65. "As a consequence, a district court may consider arguments about public-interest factors only." *Id*. at 64 n.6.

"Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id*. at 64; *see also id*. at 62 ("Only under

12

extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied."). "When deciding a motion to transfer venue based on a forum-selection clause, courts may freely consider evidence outside the pleadings." *Custer v. Thor Motor Coach, Inc.*, No. 119CV595AJTJFA, 2019 WL 8889999, at *1 n.2 (E.D. Va. June 18, 2019).

"Under § 1404(a), the court has authority only to transfer the entire civil action, not individual claims." *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824, 828 (E.D. Va. 2004). "Because § 1404(a) only allows transfer of entire actions, in appropriate cases, the court may sever some claims, transfer the severed claims, and stay the remaining claims pending the outcome of the transferred action." *Id*. n.1 (citing *Corry v. CFM Majestic Inc.*, 16 F. Supp. 2d 660 (E.D. Va. 1998)). "However, 'severance and transfer is a wholly unappealing alternative [where a defendant] is centrally involved in the litigation.'" *Id*. (citing *United States v. Douglas*, 626 F. Supp. 621, 625 (E.D. Va. 1985)). Indeed, "courts have adhered to the general rule that a § 1404(a) transfer contemplates a plenary transfer of the entire case." *Nunes v. WP Co., LLC*, No. 3:20-CV-146, 2020 WL 2616707, at *2 (E.D. Va. May 22, 2020) (citing *TechnoSteel, LLC v. Beers Const. Co.*, 271 F.3d 151, 157 (4th Cir. 2001)).

### B. 28 U.S.C. § 1404(a) Warrants Transfer for Several Reasons, Particularly Because the Parties Agreed to Jurisdiction and Venue Elsewhere.

#### i. The Parties Agreed Any Action Related to the Software—Its Ownership, Licensing, or Use—Would be Adjudicated in Indiana.

The Parties agreed in the EULA and SCLA that any dispute related to ownership, licensing or use of the Haptic and Haptic Federal software must be resolved in a federal or state court for Hamilton County, Indiana. The federal court covering Hamilton County is the Southern District

of Indiana, Indianapolis Division.[5] The Parties' agreement on forum/venue covers all of TEG's claims including, crucially, Count I for half ownership of all of MAX's software. The EULA and SCLA also cover nearly all of MAX's contemplated claims. *See* Ex. D. Therefore, the Court should enforce the Parties' agreement by transferring the Action to the Southern District of Indiana, Indianapolis Division.

The EULA contains a forum/venue selection clause stating that Indiana is the exclusive jurisdiction for legal proceedings: "Any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana and the parties hereto hereby submit generally and unconditionally to the personal and exclusive jurisdiction and venue of these courts in respect to any such matter and consent to service of process by any means authorized by Indiana law." Ex. B, § 9.4.2. Further, Indiana law governs disputes related to the EULA: "To the extent permitted by applicable law, this EULA, and any disputes or claims arising out of or in connection with it, or its subject matter or formation (including non-contractual disputes or claims) are governed by and construed in accordance with the laws of the United States and the State of Indiana, without giving effect to any principles of conflicts of laws. . . ." Ex. B, § 9.4.1.

Likewise, the SCLA states that Indiana law governs and that Indiana is the exclusive jurisdiction for legal proceedings: "This Agreement is governed by and construed in accordance with the internal laws of the State of Indiana without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Indiana. Any legal suit, action, or proceeding arising out of or related to

---

[5] As explained in section II, *supra*, the Southern District of Indiana, Indianapolis Division, would be a proper forum to resolve this Action.

this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States in Indiana or the courts of the State of Indiana located in the City of Carmel and County of Hamilton, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding." Ex. C, § 12(f).

Count I of TEG's Complaint "requests that the Court declare the software [referring to 'Haptic, Haptic Federal, Haptic Commercial or Alleo'], and all versions of it, is owned by TEG and Max Minds on a 50/50 basis." (Compl., ¶ 65, Dkt. 1.) This plainly falls under the ownership provisions of the EULA and SCLA. Ex. B, § 5; Ex. C, § 7(a). The JVA does not address ownership. And even if it did, the SCLA "supersedes all prior and contemporaneous [agreements] with respect to [the subject matter of the SCLA,]" including the JVA. Ex. C, § 12(a). Moreover, the JVA does not even contain a forum/venue selection clause.

Count II alleges that "Max Minds breached the JV Agreement by failing to create and maintain a functioning source code."[6] (Compl., ¶ 65, Dkt. 1.) This count is also "arising out of or related to" the SCLA by which MAX agreed to grant TEG "license during the Term to use the Source Code for the Software" and MAX obligated itself to "deliver the Source Code and Documentation [ ] to TEG[.]" Ex. C, §§ 2(a), 2(d), 12(f). Again, the SCLA supersedes the JVA as to subject matter covered in the SCLA. Ex. C, § 12(a). And even if it did not, the SCLA's forum/venue selection clause controls in the absence of such a clause in the JVA.

Count III alleges that "Max Minds breached the implied warranty of fitness for a particular purpose[.]" (Compl., ¶ 70, Dkt. 1.) The SCLA disclaims liability from potential breach of the

---

[6] The referenced JVA provision states that "Retainer payments will be used by MAX for the following: Create and maintain a branch of the Haptic source code, called Haptic Federal; . . ." (Compl., Ex. 1, at 1, Dkt. 1.)

15

implied warranty of fitness for a particular purpose.[7] Ex. C, § 8. MAX intends to rely on the disclaimer in the SCLA for one of its defenses to Count III of TEG's complaint. Therefore, this count is "related to" the SCLA and must be brought in Indiana pursuant to the SCLA's forum/venue selection clause. Ex. C, § 12(f). Notably, the JVA does not mention warranty.

Count IV alleges that MAX failed to share licensing revenue pursuant to the JVA. This count is predicated on TEG's allegation in Count I that it owns half of MAX's software. As with Count I, MAX's defense of Count IV will involve the ownership provision of the SCLA (and the EULA), among other things. Therefore, this count is "related to" the SCLA and must be brought in Indiana pursuant to the SCLA's forum/venue selection clause. Ex. C, § 12(f).

Count V alleges that MAX failed its obligations under the Parties' NDA to keep TEG's confidential information from third parties. While TEG's allegations are vague, the alleged confidential information at issue seems to be information that MAX used to create the code for its software products. (*See* Compl., ¶ 28, Dkt. 1.) MAX intends to argue, among other defenses, that it did not use any of TEG's confidential information to create Haptic or Haptic Federal. As stated in the SCLA, "Licensor [MAX] has developed the Software[.]" Ex. C at 1. Therefore, this count is "related to" the SCLA and must be brought in Indiana pursuant to the SCLA's forum/venue selection clause. Ex. C, § 12(f). Notably, the NDA does not contain a forum/venue selection clause.

As previously noted, the crux of this case is Count I that addresses ownership of all of MAX's software products. This claim must be litigated in Indiana. Therefore, even if the Court determines that other claims in TEG's complaint are not subject to the forum/venue selection

---

[7] The EULA also disclaims any warranty for potential liability due to breach of the implied warranty of fitness for a particular purpose. Ex. B, § 5.

clauses of the EULA and SCLA, the entire complaint should be transferred, along with the issue of ownership that is the central issue in this case. *One Beacon Ins. Co.*, 312 F. Supp. 2d at 828 n.1 ("In this case, severance would be inappropriate because the issue of Global's negligence is central to the amended complaint, counterclaims, third-party claims, and cross-claim."). The entire action should be transferred pursuant to the Parties' agreements.

### ii. Because the Parties Preselected Indiana, § 1404(a) Dictates That the Case Should Be Transferred Absent TEG Demonstrating That Transfer Is Inappropriate.

"Because the parties have already agreed to a proper forum, the Court should typically only consider the public-interest factors, including 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 703 (E.D. Va. 2020) (citing *Atlantic Marine*, 571 U.S. at 64 n.6). Additionally, "[j]udicial economy and the avoidance of inconsistent judgments" are prominent public-interest factors in venue transfer analysis. *E.g.*, *Seaman v. IAC/InterActiveCorp, Inc.*, No. 3:18-CV-401, 2019 WL 1474392, at *7 (E.D. Va. Apr. 3, 2019). It is difficult to conceive of any public-interest factors that might rise to the level of concern to defeat MAX's transfer motion and invalidate the agreed-upon forum/venue selection. Rather, the public-interest factors weigh heavily toward litigating the entire Action in a single court in Indiana.

First, all of TEG's claims (not to mention MAX's contemplated claims, *see* Ex. D) are covered under the EULA and/or SCLA, which are governed by Indiana law.[8] Ex. B, § 9.4.1; Ex.

---

[8] The JVA does not contain a choice of law provision. It is arguably governed by Indiana law since Indiana is where MAX performed its obligations under the JVA. *AdvanFort Co. v. Zamil Offshore Servs. Co.*, No. 123CV906LMBIDD, 2023 WL 8357941, at *8 (E.D. Va. Dec. 1, 2023) ("For contract claims, questions arising from the performance of a contract are governed by the law of the place of performance.").

C, § 12(f). Forums in Indiana are the most familiar with Indiana contract law. Therefore, this public-interest factor weighs in favor of transfer. *Custer*, No. 119CV595AJTJFA, 2019 WL 8889999, at *1 (granting motion to transfer where "Limited Warranty specifically states that Indiana law applies as to 'any and all claims, controversies and causes of action arising out of or relating to this Limited Warranty,' which would clearly include Plaintiff's claims here.") (citation omitted).

Second, keeping the Action in Virginia would create judicial inefficiency and risk inconsistent rulings. As detailed in MAX's draft complaint, MAX has numerous causes of action against TEG, nearly all of which arise under the EULA and/or are related to the SCLA because they are either counts for breach of contract or counts based on MAX's rightful ownership of its software. *See* Ex. D. Any claim under the EULA or related to the SCLA cannot be raised in this Court, even as a compulsory counterclaim, and MAX would bring those claims in Indiana. *Kenray, Inc. v. Judson Atkinson Candies, Inc.*, No. NA 02-132-C BH, 2002 WL 2012439, at *3 (S.D. Ind. Aug. 28, 2002) ("A party to a forum selection clause may not raise in a different forum, even as a compulsory counterclaim, a dispute within the scope of that clause.") (citing *Publicis Communication v. True North Communications, Inc.*, 132 F.3d 363, 365-66 (7th Cir. 1997)). Thus, keeping this case in Virginia would result in two lawsuits in two separate courts over the same facts and legal issues, thereby creating judicial inefficiency and the risk of inconsistent rulings. *Waterman v. Thor Motor Coach, Inc.*, No. 3:19-CV-890, 2020 WL 1290595, at *8 (E.D. Va. Mar. 18, 2020) (litigating in two different places "amount[s] to a waste of judicial resources."); *Chruby v. Global Tel*Link Corp.*, 119 F.Supp.3d 399, 403 (E.D. Va. Mar. 10, 2015) ("Transferring the case would prevent duplicative and overlapping class action litigation and with that the possibility of inconsistent rulings.").

For many of the same reasons, a partial transfer of TEG's claims to Indiana while severing other claims would create the same challenges as the claims are grounded in the same underlying facts. *See Waterman*, No. 3:19-CV-890, 2020 WL 1290595, at *8 ("The Court is mindful that severance of the claims, which are grounded in the same underlying facts, could lead to inconsistent factual findings, which runs counter to the public's interest in cases proceeding expeditiously, efficiently and fairly in federal court. Transferring an entire case is preferable to severance.") (citation omitted). In sum, the Court should enforce the Parties' agreements to litigate this dispute in Indiana.

## CONCLUSION

For all these reasons, Defendant Max Minds, LLC respectfully requests that this Court grant its motion and either dismiss this Action pursuant to Rule 12(b)(2) or Rule 12(b)(3) or transfer it in its entirety to the Southern District of Indiana, Indianapolis Division, pursuant to either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a) and grant such further relief as this Court may find just, proper, and equitable.

Date: March 4, 2024

Respectfully submitted,

/s/ Timothy D. Belevetz
Timothy D. Belevetz (VSB No. 36110)
ICE MILLER LLP
200 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001
202-572-1605
timothy.belevetz@icemiller.com

George A. Gasper (admitted *pro hac vice*)
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282
317-236-2100
george.gasper@icemiller.com

Counsel for Defendant Max Minds, LLC

## CERTIFICATE OF SERVICE

       I certify that on this 4th day of March, 2024, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which sends a notification of such filing to all counsel of record.

       /s/ Timothy D. Belevetz
Timothy D. Belevetz
ICE MILLER LLP
200 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001
202-572-1605
timothy.belevetz@icemiller.com