# EXHIBIT D

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MAX MINDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CAUSE NO. _____ |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| TRIANGLE EXPERIENCE GROUP. INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## **<u>COMPLAINT</u>**

Max Minds, LLC, ("MAX" or "Plaintiff") by counsel, hereby files this Complaint and alleges the following against Triangle Experience Group, Inc. ("TEG" or "Defendant"):

1.      MAX is filing this lawsuit to protect its intellectual property from its former business partner, TEG; retrieve monies owed to MAX due to TEG's numerous and overt breaches of the agreements between them; and for other relief to compensate for TEG's malign behavior.

2.      MAX creates highly functional software platforms for commercial and governmental applications. MAX and TEG engaged in a business relationship whereby TEG agreed to create a distribution channel to license one of MAX's products, "Haptic Federal," to customers in the federal government. This was memorialized in a Joint Venture Agreement (the "JVA"), attached hereto as **<u>Exhibit 1</u>**.

3.      The JVA provided that TEG would be the exclusive distributor of MAX's federal government product, Haptic Federal, so long as TEG hit certain licensing goals and shared half the revenue with MAX.

4.      In addition to the JVA, the parties entered into an End User License Agreement (the "EULA"), attached herewith as **Exhibit 2**, and a Source Code License Agreement (the "SCLA"), attached herewith as **Exhibit 3**. The EULA and SCLA agreements provide that MAX is the sole owner of the Haptic Federal software.

5.      TEG repeatedly breached the JVA, EULA and SCLA contracts and infringed on MAX's intellectual property rights by, among things, copying MAX's software, making derivative copies of that software, rebranding that software and claiming it as TEG's own creation. TEG, moreover, generated tens of millions of dollars in revenue, much of which was not properly disclosed to (let alone shared with) MAX.

6.      As a result of TEG's improper actions, MAX has suffered millions of dollars in damages and is further entitled to injunctive relief.

## PARTIES

7.      MAX is an Indiana limited liability company, with its principal place of business in Carmel, Indiana and an address of 12400 North Meridian Street, Suite 175 Carmel, IN 46032. MAX creates cutting edge software platforms for commercial and governmental applications. MAX's sole member is Brandon Fischer ("Mr. Fischer") who is domiciled in Indiana.  Mr. Fischer is also MAX's CEO and founder.

8.      TEG is a Virginia stock corporation with its principal place of business at 11182 Hopson Road, Suite A, Ashland, VA 23005. TEG is a reseller of military technology created by other companies. The President and CEO of TEG is Rob Clare.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this matter involves claims between citizens of different states where the amount in controversy exceeds $75,000.

10.     This Court has subject matter jurisdiction over Plaintiff's claims for copyright infringement pursuant to 17 U.S.C. §§ 101, et seq., and 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has subject matter jurisdiction over Plaintiff's claim for trademark infringement pursuant to 15 U.S.C. §1051, et seq., and 28 U.S.C. §§ 1331 and 1338(a).

12.     This Court has supplemental jurisdiction over Plaintiff's claims arising under the laws of Indiana pursuant to 28 U.S.C. § 1367(a) because these claims are so related to Plaintiff's claims under Federal Law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

13.     This Court has personal jurisdiction over Defendant TEG because TEG waived any objection to this Court's personal jurisdiction when it agreed to the forum/venue selection clauses of the EULA and SCLA. The EULA and SCLA were agreed to by both parties and include clauses that designate Indiana as the proper venue for any case or controversy arising from the EULA or SCLA. The SCLA further designates Indiana as the proper venue for any controversy relating to the SCLA.

14.     This Court also has personal jurisdiction over TEG because, among other things (i) this case arises out of agreements made or to be performed in Indiana and (ii) TEG has derived substantial revenue from goods and/or services rendered in Indiana and from interstate commerce.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because TEG "resides" in the Southern District of Indiana given that TEG is subject to

personal jurisdiction in this District. Additionally, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.

## FACTUAL ALLEGATIONS

### A. MAX's founder, Brandon Fischer, is a successful innovator and entrepreneur.

16.     Mr. Fischer is a software developer and entrepreneur who lives in Carmel, Indiana.

17.     In 2005, Mr. Fischer founded and served as CEO of a software development company called Anacore. In 2010, Anacore created a software platform called "Synthesis" that proved to be a valuable product.

18.     In 2014, Anacore was acquired by Silicon Valley company Prysm. Through this acquisition Prysm gained ownership of the Synthesis source code.  Following the acquisition, Mr. Fischer was made the Vice President of Research and Development of Prysm.

19.     On March 1, 2018, Mr. Fischer left Prysm and, on May 3, 2018, founded MAX as an Indiana company. Fischer founded MAX initially an as an entity through which he could perform some consulting work with Prysm but MAX later began developing software on its own and bringing products to market.

### B. MAX independently created and marketed the Haptic platform in 2019.

20.     In or around March 2019, MAX began development of a software product called "Haptic," with full-time development beginning in May 2019. Haptic is an interactive content collaboration software and was originally designed for use in both the public and private sector. MAX created Haptic independently.

21.     Haptic enables teams to communicate seamlessly and in real-time. The platform's powerful tools help teams manage tasks, share files, and stay organized. The software is capable

4

of numerous functions such as creating: Briefing and experience centers; ideation and insight centers; customizable collaboration spaces; and dashboarding and operations centers.

22.     In June 2019, MAX demonstrated Haptic to industry partners and potential commercial customers at InfoComm.

23.     In July 2019, MAX conducted another demonstration of the Haptic platform to industry partners and potential customers. MAX demonstrated Haptic to at least a dozen individuals during that demonstration. The demonstration resulted in the first license of Haptic to a government agency in August 2019 through MAX's first licensing partner.

24.     On or about October 1, 2019, MAX published a video demonstration of Haptic showing a highly functional product. The video demonstration can be viewed at this URL: https://vimeo.com/363671367/409066cb0e.

25.     In or about November 2019, Mr. Fischer installed Haptic for the first licensee, a U.S. government agency. MAX had a fully functioning version of Haptic at this time.

**C.  MAX requires licensees to agree to an End User License Agreement to protect MAX's intellectual property.**

26.     Prior to installing the Haptic software on any licensee systems, licensees must accept the terms provided in an End User License Agreement (the "EULA").

27.     The EULA uses the term "Product" defined as "the Haptic application, software, their associated upgrades, patches, and updates and related services (the 'Product') currently provided or which will be provided by **Max Minds, LLC dba Haptic**, or any one of its subsidiaries or affiliated companies (collectively referred to as 'HAPTIC')." Ex. 2, at 1.

28.     Section 1 of the EULA ("Grant of License") states, in part: "HAPTIC (or its licensors) grants You a non-exclusive, non-transferable, non-sublicensed, non-commercial and

personal license to install and/or use the Product . . . for such time until either You or HAPTIC terminates this EULA. . . . THIS PRODUCT IS LICENSED TO YOU, NOT SOLD." Ex. 2, § 1.1.

29.     Section 1 of the EULA goes on to specify: "You shall not, directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product (except if the Product enables You through a specific feature to create, generate or submit User Generated Content and for which You will need to create an Account and comply Terms of Use), in whole or in part; (iii) create, use and/or distribute 'auto', 'trainer', 'script' or 'macro' computer programs or other 'cheat' or 'hack' programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." Ex. 2, § 1.2.

30.     Section 2 of the EULA ("Ownership") states: "All title, ownership rights and intellectual property rights in and to the Product [ ] and any and all copies thereof are owned by HAPTIC or its licensors. . . . This License confers no title or ownership in the Product and should not be construed as a sale of any rights in the Product." Ex. 2, § 2.

31.     The EULA is governed "in accordance with the laws of the United States and the State of Indiana." Ex. 2, § 9.4.1. The EULA contains a forum/venue selection clause stating "any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana[.]" Ex. 2, § 9.4.2.

32.     TEG has agreed to the applicable EULA numerous times prior to installations of Haptic or Haptic branch products. Additionally, TEG's CEO Rob Clare acknowledged acceptance of the terms EULA in an email dated August 10, 2020.

**D. TEG business practices exploit software development companies.**

33.     TEG is a software distributor that represents itself as specializing in providing software to the U.S. Government.

34.     TEG improperly rebrands the third-party software it licenses to the government under "C4MAP" which is an acronym for "Comprehensive Collaborative Command and Control Mission Application Platform." TEG also uses "VJOC," an abbreviation for Virtual Joint Operations Center, when supplying third-party software to the government.

35.     By using the "C4MAP" brand, TEG can switch out the underlying software platform without notifying customers, including the U.S. government, simply by adjusting the version number. Further, the brand name obfuscates the fact that the partner company actually creates and develops the software.

36.     TEG also uses the "C4MAP" brand to negotiate more favorable deals with the U.S. government by presenting itself as the sole provider of C4MAP in order to obtain sole-source contracts with premium prices due to the absence of alternative providers.

37.     In 2016, TEG began working with software company Hadron Industries, Inc. ("Hadron"). That relationship appears to have broken down and, as alleged in a 2018 lawsuit filed by Hadron against TEG, 1:19-cv-00035 E.D.Va., TEG rebranded Hadron's product without permission and called it "C4MAP 1.0". In the 2018 lawsuit, Hadron alleged unfair business practices, tortious interference with business relations and prospective advantage, violations of the Lanham Act, conspiracy, breach of contract, breach of the covenant of good faith and fair dealing, commercial disparagement, defamation, conversion, and unjust enrichment.

7

**E. TEG sought out MAX to be its new partner.**

38.     Mr. Fischer met TEG in 2016 in connection with TEG operating as a licensed distributor of Prysm's Synthesis software.

39.     In or about March 2018, less than 3 weeks after Mr. Fischer departed from Prysm, TEG initiated contact with Mr. Fischer by phone and inquired about working with Mr. Fischer. TEG was aware of Mr. Fischer's involvement in the development of the Synthesis software and, notwithstanding its knowledge of Prysm's ownership of the Synthesis software, asked Mr. Fischer if he could make modifications to the Synthesis source code.

40.     In response, Mr. Fischer indicated that he was subject to a Non-Compete Agreement with Prysm at the time. Mr. Fischer advised TEG that to work together prior to the expiration of the Non-Compete Agreement, TEG would first need to (1) license the source code from Prysm, and (2) obtain permission from Prysm for Mr. Fischer to collaborate with TEG.

41.     A few months after the expiration of the Non-Compete Agreement in February 2019, Mr. Fischer invited TEG to the above-referenced July 2019 demonstration of Haptic. TEG declined the invitation and instead invited MAX to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia.

42.     The purpose of the meeting at the Joint Staff Lab was for MAX to demonstrate the Haptic platform to TEG and leaders within the Joint Staff Lab, *i.e.* potential customers. Prior to this demonstration, MAX and TEG entered into a mutual Non-Disclosure Agreement ("NDA"), attached herewith as **Exhibit 4**.

43.     Unbeknownst to MAX, the demonstration at the Joint Staff Lab fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract and TEG used the demonstration to pitch the government for an additional contract award. On July 25, 2019,

a week after the demonstration, TEG received a $16.6 million contract award. The contract award is described as "Cross Domain Solutions- Comprehensive, Collaborative, Command and Control Mission Application Platform Service" which is longhand for C4MAP. TEG did not disclose the existence of either the sole-source contract or the contract award to MAX.

44.     Unaware of TEG's exploitation of Mr. Fischer's presentation, MAX continued to develop the Haptic product independently. There was no collaboration between TEG and MAX with respect to developing Haptic.

45.     On October 2, 2019, Mr. Fischer provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic user accounts. This allowed TEG to access and demonstrate the Haptic platform live to their customers. Before signing-in, all users (which includes TEG) were required by the Haptic software to read, acknowledge, and assent to the terms of the Haptic Privacy Policy, attached herewith as **Exhibit 5**. Additionally, in or around August 2020 the Haptic software required users signing-in to agree to the EULA described above.

46.     Impressed with Haptic's capabilities, Rob Clare contacted Mr. Fischer on November 3, 2019, to discuss how TEG could become an authorized reseller of the Haptic software to the U.S. Government TEG requested a meeting and Mr. Fischer met with TEG later that month. TEG then requested that MAX visit TEG in January 2020, and offered to pay for MAX's entire trip including expenses, which MAX accepted.

**F.  MAX and TEG executed the Joint Venture Agreement under which TEG would manage a distribution channel to the federal government for MAX's Haptic Federal product.**

47.     For at least six months in 2019, MAX had been marketing Haptic to commercial entities and the U.S. government. Then on January 23, 2020, MAX and TEG entered into the JVA, which related to a new product specifically for customers in the federal government market.

48.     The JVA stated that MAX would "[c]reate and maintain a branch of the Haptic source code, called Haptic Federal" that would be "for exclusive use by the US government." Ex. 1, at 1. The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]" *Id*. at 2. The JVA pertains to the Haptic Federal product only.

49.     Both Haptic and Haptic Federal continued to evolve independently in parallel. MAX is the sole owner of the copyrights in the Haptic and Haptic Federal software, including all versions of both Haptic and Haptic Federal.

50.     Haptic Federal is a server-based collaborative workspace that utilizes a browser interface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit users to select and share the display window of individual programs from their workstations to the Haptic Federal workspace. Haptic Federal is an infinite canvas of screen real estate that operates synchronously for all members in real-time. Haptic Federal is both the front-end operating system and underlying source code that is responsible for delivering these capabilities.

51.     Haptic Federal offers substantial benefits, and its capabilities are highly regarded within the defense community.

52.     Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements." *Id*. at 1. TEG was required to "establish and manage all federal channel sales partnerships." *Id*. at 3.

53.     Although TEG was to manage the federal distribution channel, the JVA required "TEG and Max [ ] to establish and share an electronic files system." *Id*. at 2. Specifically, "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals,

Marketing materials, [and] Activity reporting to government customers[.]" *Id*. "TEG and MAX agree[d] to conduct routine project and program management review discussions." *Id*.

54.     Additionally, the JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. *Id*. at 1. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months. *Id*.  Nothing in the JVA granted TEG ownership rights in the Haptic Federal software.

55.     With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]" *Id*. at 3. However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue." *Id*.

56.     Notably, the JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software.

57.     MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." *Id*. However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred. *Id*. at 2.

58.     As stated above, the EULA for the Haptic Federal software makes clear MAX is the sole owner of that software.

**G. From the start of their relationship, TEG lied to MAX and concealed material information.**

59.     TEG's conduct, most or all of which was unknown to MAX at the time, indicates TEG's intent to skirt its contractual obligations and the law from the start.

60.     Unbeknown to MAX, after TEG and MAX signed the JVA in January 2020, TEG used the Haptic Federal software to fulfill commitments that TEG had previously made to the U.S. Government.  Said commitments arose out of a $49.5 million sole source contract, awarded to TEG in 2016 and ending in October 2021.

61.     TEG did not disclose the existence of MAX as the software provider in the contracts that TEG signed and executed with the federal government customer(s) pursuant to this sole source contract. Instead, TEG presented itself as the sole owner and developer of the software.

62.     Under the JVA, TEG was required to create a federal distribution channel for MAX to sell licenses of Haptic Federal.  Contrary to this obligation to MAX, TEG presented itself as the sole source of the product to the U.S. Government. It appears that TEG did not begin any effort to build a federal distribution channel for MAX until TEG's sole source government contract ended on October 12, 2021—that is, to the extent TEG made any effort to build a distribution channel for MAX at all.

63.     Part of TEG's overall scheme to position itself as the sole source of the product was to engage in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names. TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC," removing the Haptic trademark. This made it easier for TEG to misrepresent Haptic Federal to industry partners and customers as its own creation.

64.     For example, TEG replaced product trademarks on the platform with TEG's own VJOC logo. TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the

U.S. Army shops for commercial information technology ("IT") software and services. Similarly, TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore. TEG also promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org.

65.    Additionally, TEG improperly marketed MAX's intellectual property as its own in various bid proposals submitted to the Government. TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals.

66.    It was not until MAX confronted TEG in March 2020, that TEG agreed that it would always call the product "C4MAP powered by Haptic." Despite this agreement, TEG later reverted to leaving out any reference to Haptic or MAX when marketing the product.

67.    TEG also lied about and concealed critical information about sales of the Haptic Federal product.

68.    Unbeknownst to MAX, TEG has been profiting from the installation and support of Haptic Federal at Army bases throughout the U.S. since the first year of the JVA. TEG received payments from the U.S. Government, totaling over $5.28 million in 2020 alone, none of which TEG disclosed to MAX. TEG remitted less than 10% of that amount to MAX in year 2020.

69.    TEG was contractually bound by the JVA to make timely payments to MAX each year. In fact, the JVA provision granting TEG exclusivity was contingent upon MAX receiving minimum (license-based) revenue targets that escalated each year. Starting in 2021, TEG did not meet any of the sales targets set forth on page 2 of the JVA because it did not report relevant sales to MAX and pocketed the money owed to MAX.

70.     TEG's failure to meet sales targets was surprising to MAX because many sales opportunities came to MAX through events and word-of-mouth.  Pursuant to the JVA, MAX referred all of these opportunities to TEG. Most of these referrals occurred in 2020.

71.     In reliance that TEG was acting in good faith, MAX continued its relationship with TEG. When MAX asked TEG about 2020 sales, TEG claimed it was "waiting on the government."

**H.  In early 2021, MAX and TEG executed a Source Code License Agreement reiterating MAX's ownership rights to Haptic Federal and setting licensing parameters.**

72.     On March 30, 2021, MAX and TEG entered into a Source Code License Agreement (the "SCLA"). Ex. 3.

73.     In the SCLA, MAX granted TEG "a non-exclusive, non-sublicensable, and non-transferrable [ ] license" for Haptic Federal. Ex. 3, § 2(a). The license was "[s]ubject to and conditioned on [TEG's] payment of Fees and compliance with all the terms and conditions of [the SCLA]." *Id*. Moreover, the SCLA "supersede[d] all prior and contemporaneous [agreements] with respect to [the subject matter of the SCLA.]" *Id*. at § 12(a).

74.     The SCLA lays out multiple "Use Restrictions" on TEG's license: [TEG] "shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party; (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law." *Id*. at § 2(b).

14

75.     With respect to intellectual property ownership, the SCLA provides that "as between [TEG] and [MAX], [MAX] owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation." *Id*. at § 7(a).

76.     Likewise, the SCLA provides that MAX is the sole owner of any and all "Feedback" (i.e. "comments, questions, suggestions") that TEG or any other user may provide. *Id*. at § 7(b).

77.     The SCLA is governed by Indiana law and includes a forum/venue selection clause mandating that "[a]ny legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States in Indiana or the courts of the State of Indiana located in the City of Carmel and County of Hamilton[, Indiana.]" *Id*. at § 12(f).

78.     MAX provided formal notice of termination of the SCLA in August 2023, the SCLA had terminated earlier due to failures in fee structure negotiations required by Exhibit A, Section 3 of the SCLA.

79.     Section 11(d) of the SCLA states "this section 11(d) and Sections 1, 5, 6, 7, 8, 9, 10, and 12 survive any termination or expiration of this Agreement."

**I.  Due to TEG's consistent misconduct, MAX and TEG's relationship had turned for the worse by the end of 2022.**

80.     Despite MAX already having compromised and allowing TEG to market Haptic Federal as "C4MAP powered by Haptic," TEG continued with its unauthorized rebranding campaign. MAX confronted TEG about the issue on May 26, 2021, via email.

81.     Due to TEG's false and misleading statements to potential customers, MAX felt it had to remind TEG that "TEG is not the exclusive provider, licensor or distributor of the Haptic (source code). MAX has provided TEG with a temporary license to the source code for a limited

time[.]" Further, MAX made it clear that TEG should not be selling or offering to sell perpetual licenses of the product. Finally, MAX pointed out "numerous instances where C4MAP or VJOC are mentioned without the phrase 'Powered by Haptic.'"

82.     Unfortunately, TEG did not change course and, instead, simply concealed more of its improper conduct from MAX.

83.     TEG's rebranding has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers.

84.     In addition, in 2020-2021, TEG misused software licenses by providing supposedly free extended trials. MAX had explained to TEG that "[e]ach 'Free Trial' must be authorized by Max/Haptic in-advance of installation." Yet in mid-2021 MAX discovered a dozen trials that TEG had extended to customers without authorization. While TEG told MAX these were free trials, it is highly likely TEG was being paid to install and support these trial installations.

85.     Further, TEG provided unauthorized trials by misusing the two software licenses that were given to TEG under the JVA for demo and testing purposes. TEG replicated the unauthorized licenses for live events and live exercises for which it received compensation. TEG also misused software licenses purchased from MAX by replicating the licenses numerous times for customers without MAX's authorization.

86.     During a call on May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy. These actions demonstrate a deliberate attempt to avoid compliance with the various agreements between MAX and TEG and have led to financial losses for MAX.

87.     For other customers, TEG misrepresented the terms of the licenses they sold by falsely characterizing them as perpetual licenses. This misrepresentation led end customers to

believe they were purchasing a perpetual license when, in fact, they were only acquiring annual licenses for MAX's software.

88.     As a result of this misrepresentation, end customers were misled into making purchasing decisions based on false information, which caused financial harm and confusion among the customers, and hurt MAX's ability to sell its products.

89.     In late 2021, the MAX team explained the importance to TEG of providing documented customer use case and requirements so that MAX could improve their release Test Plan and avoid bugs in future releases. In fact, the JVA requires that "TEG will deliver, deploy, sustain and develop customer requirements." Ex. 1, at 1. The MAX team also emphasized to TEG the need to conduct testing of their own and, if necessary, provide feedback to MAX before upgrading the software at the customer site. Unfortunately, TEG simply did not provide the critical feedback or perform the testing that MAX identified.

90.     The JVA also required TEG to "maintain a web presence for marketing material of the Haptic Federal product." But TEG waited 34 months, until November 2022, to update their website and begin to publicly promote the product offering.

91.     Unbeknownst to MAX, TEG was also concealing discounts that it provided to customers. Under the JVA, discounts were to be subtracted from TEG's share of the revenue. Ex. 1, at 3. By concealing discounts, TEG deprived MAX of payments that it was owed under the JVA.

92.     For example, one invoice from December 3, 2021, included a 50% discount. Under the JVA, a 50% discount should result in all revenue flowing to MAX. TEG concealed the discount from MAX and consequently concealed information MAX needed to understand the proper allocation of revenues.

93.     TEG continued to conceal sales in 2021. When it failed to meet the 2021 revenue target, based upon the sales information reported to MAX, TEG claimed it was "waiting on the government" to receive funds. In reality, TEG received payments from the U.S. Government, totaling over $2.41 million in 2021. TEG remitted less than a third of that amount as license-based revenue to MAX.

94.     Believing that TEG was acting in good faith, MAX allowed TEG to make a $385,000 payment to MAX to reach the minimum target in 2021 and MAX and TEG continued their relationship.

95.     A year later, at the end of 2022, TEG was $1.8 million short of the JVA's revenue target. Ex. 1, at 2. MAX and TEG attempted to renegotiate the terms of their agreements, including the JVA, and remove the revenue targets from the JVA that were required for exclusivity. No agreement was reached to modify the JVA terms.

96.     Because TEG was still in breach of the JVA, MAX proposed an alternative whereby TEG would count the $1.8 million payment toward pre-purchase licenses. This way, TEG could retain its exclusivity into 2023. TEG refused this offer.

97.     Despite not having previously claimed that issues with the Haptic Federal software were preventing sales, TEG then began making such assertions. In one such assertion TEG stated "how can you expect us to pay for licenses when you've never given us a product that works."

98.     Given that TEG refused to agree to any reasonable alternative, ultimately, MAX demanded a $1.8 million makeup payment, although the JVA required the money to come from sales revenue. TEG sent $1.8 million payment.

99.     Notwithstanding its assertions that the Haptic Federal software was "unsellable," TEG was in fact able sell licenses of Haptic Federal. TEG sold approximately $2.5 million of

Haptic Federal licenses in 2022. As had become standard practice for TEG, it did not disclose these sales to MAX.

**J.   TEG escalated its inappropriate behavior in 2023, leading to the end of the partnership and TEG filing suit to steal MAX's intellectual property.**

100.   Throughout 2023, it became more and more difficult for MAX to work with TEG as TEG's behavior grew increasingly outrageous.

101.   On January 10, 2023, an issue arose during a test of the Haptic Federal product. TEG attempted to blame MAX for the issue, but the problem resulted from TEG's failure to follow MAX's instructions for using the product. TEG had attempted to test the product with over 140 users signed in simultaneously, with audio enabled, and multiple live screen shares occurring simultaneously. MAX had previously notified TEG that such a high level of concurrent usage far exceeded the intended capabilities of the Haptic Federal software.

102.   On January 26, 2023, TEG again failed to follow MAX's instructions regarding proper use of the product. During a dress rehearsal for a full Department of Defense exercise, TEG allowed as many as 400 users to sign in simultaneously.  TEG's failure to follow MAX's instructions for use of the product resulted in a degradation in performance which reflected negatively on the Haptic Federal product.

103.   The JVA contains an annual renewal requirement for customers to receive continued support and software upgrades. Ex. 1, at 2. MAX had notified TEG in November 2021 that support for the first customer licenses would begin to expire in early 2023 if customers did not renew. In February 2023, TEG told MAX that all customers decided not to renew their support, but TEG has continued to support these customers and has improperly retained the undisclosed support revenue for itself. MAX is owed its proper share of the renewal fees for any licenses TEG has continued to support.

104.    TEG also started referring to itself as "co-manufacturer" of the product to third parties despite MAX being the sole owner of all rights in the Haptic Federal software.

105.    TEG's violations of the parties' agreements are extensive. For example, on calls TEG personnel have referred to U.S. Special Operations Command (SOCOM) as a paying customer but TEG has not purchased licenses for SOCOM nor has TEG paid any fees to MAX for any license to SOCOM.

106.    TEG has also made false and damaging statements about Mr. Fischer and MAX to customers and industry partners.

107.    TEG incorrectly told third parties that Mr. Fischer and MAX were to blame for perceived deficiencies with the product. As discussed *supra*, TEG falsely described itself as a creator and developer of the product. TEG also misrepresented the history of the parties' relationship, falsely asserting that Mr. Fischer initially inquired about providing Prysm's source code to power C4MAP in violation of his non-compete agreement with Prysm. TEG's false statements have caused harm to Mr. Fischer's reputation and MAX's business interests.

108.    On May 5, 2023, via phone, TEG repeated to MAX its new narrative that it did not have a product that it could sell. This was patently false.

109.    In 2023, TEG generated at least $2.5 million dollars of revenue by selling new licenses and providing support for Haptic Federal. TEG generated even more sales in 2023 than it did in 2022. TEG did not disclose these sales to MAX.

110.    TEG was awarded a new 5-year, sole-source, $49.5M government contract in March 2022 that runs from 2022-2027.

111.    Contrary to TEG's assertions that the Haptic Federal product did not work, every software release of Haptic Federal met the requirements outlined in the JVA and passed the version of the software Test Plan that was applicable at the time.

112.    There have been over 30 releases of Haptic Federal since the signing of the JVA, each containing numerous updates and improvements. This far exceeds the 16 releases required under the JVA. Ex. 1, at 1.

113.    TEG's failure to comply with the terms of the JVA has hampered development of additional functionality for the Haptic Federal product. In accordance with TEG's obligation under the JVA to "develop customer requirements," MAX has consistently asked TEG to document the customer requirements and use case(s) so that MAX can be even more proactive and identify bugs/issues before every software release. Ex. 1, at 1. TEG has consistently failed to provide a thorough Test Plan.

114.    TEG has installed new software releases at customer sites prior to TEG's own testing and validation resulting in performance issues which reflect negatively on the Haptic Federal product. MAX could have ameliorated the effects of TEG's reckless behavior if TEG had not acted in violation of the JVA. The JVA requires that the instances of Haptic Federal provided to TEG by MAX "will be installed in the TEG commercial data center . . . and access will be given to MAX personnel." Ex. 1, at 2. TEG failed to give access to MAX.

115.    In addition to the foregoing issues, software failures that may have occurred between 2020-2023 were a result of one or more of the following: (1) TEG's failure to inform MAX of new customer requirements, prior to a software release; (2) TEG allowing end customers to use the software beyond its designed and intended capabilities; (3) TEG's failure to properly

train end users; and/or (4) variables within the customer environment, such as poor network conditions, that were outside of MAX's control.

116.    TEG even promised customers "vaporware," *i.e.* features of Haptic Federal that were not ready for customer use. For example, TEG promised customers "JWICS" (Joint Worldwide Intelligence Communication System) functionality without any input or involvement from MAX. MAX had never indicated or even suggested to TEG that JWICS functionality was ready to be part of an upcoming release.

117.    Because TEG overpromised functionality to customers, those customers expressed their unhappiness to TEG. To the extent that TEG did disclose MAX's involvement, TEG lied and blamed MAX for any deficiencies.

118.    TEG also failed to protect the Haptic Federal Source Code. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. In most cases, TEG provided MAX with a "chain of custody" document that should have signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan. In the summer of 2023, TEG failed to provide chain of custody documentation multiple times.

119.    As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The Certification Agreement is attached as **Exhibit 6**. The agreement was intended to formalize confidentiality safeguards for Haptic Federal.

120.    The Certification Agreement mandates that "all copies of the Source Code that have been provided to TEG and/or to a TEG customer have been destroyed, and have not been retained by any entity." Ex. 6, ¶ 2. Further, the Certification Agreement mandates that "TEG shall secure

from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)." *Id*., at ¶ 3.

121.    MAX recently learned that TEG had retained and copied a version of the Haptic Federal source code in late 2022 or early 2023, prior to the release of version 3.1.21.4. This is a fact that TEG materially misrepresented when they signed the Certification Agreement. TEG has been creating their own parallel version of the Haptic Federal software since that point.

122.    TEG continues to violate the terms of the Certification Agreement. For the two most recent source code transfers (3.1.21.8 and 3.1.21.9) on September 13 and September 22, 2023, respectively, TEG has (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code.

123.    MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. TEG has willfully endangered the Haptic Federal source code, resulting in damage to MAX.

124.    It is unsurprising that TEG failed to protect the source code from unauthorized distribution or tampering since TEG itself has tampered with the source code. As discussed above, TEG made at least over $5 million of software/service sales using Haptic Federal in 2022 and 2023 that TEG never disclosed to MAX. In each case, TEG would need a license key to install the software. To get around this requirement, TEG has retained and modified the Haptic Federal source code by stripping or modifying the licensing logic to provide the software to those new customers.

125.    Evidence of TEG's modification of the source code is shown in **Exhibit 7** which is a screenshot of a login page for the "VJOC" software, which is identical to the Haptic login except

that it is rebranded as "VJOC", which shows a current version of 3.1.21.13. On information and belief, TEG copied a version of the Haptic Federal source code from late 2022 or early 2023 and has created a number of derivative works in the form of version releases including 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

126.    Further evidence of TEG's copying and rebranding of the Haptic Federal source code is seen in a comparison on the user interface of the Haptic Federal product and the user interface of a TEG software product pictured on TEG's website. Images of the Haptic Federal software and the software copied and rebranded by TEG are shown in **Exhibit 8.**

127.    TEG has replaced the Haptic Federal product trademarks with their own VJOC logo in order to pass off the Haptic Federal product as its own.

**COUNT I**
**(Breach of Contract – Source Code License Agreement)**

128.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

129.    MAX entered into a Source Code License Agreement in connection with its business relationship with TEG. The Source Code License Agreement constitutes a valid and enforceable contract.

130.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Source Code License Agreement by various acts and omissions including, without limitation, the following:

    a.   Misusing software licenses provided by MAX.

    b.   Falsely characterizing license sales to customers as perpetual licenses.

    c.   Tampering with and/or modifying a version of the Haptic Federal source code released in early 2023 or early 2022 to create at least five subsequent derivative

24

works including versions 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

d.   Retaining the Haptic Federal source code in violation of its obligation to delete that software.

e.   Replacing logos in Haptic Federal with TEG's logos.

f.   Engaging in unauthorized and/or illegal license distribution and circumventing the license key requirement of Haptic Federal.

131.   MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the Source Code License Agreement.

132.   As a direct and proximate result of TEG's breach of the Source Code License Agreement, MAX has been damaged in an amount to be proven at trial.

133.   MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

<u>**COUNT II**</u>
**(Breach of Contract – End User License Agreement)**

134.   MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

135.   MAX entered into an End User License Agreement in connection with its business relationship with TEG. The End User License Agreement constitutes a valid and enforceable contract.

136.   TEG has breached the terms, covenants, promises, provisions, and warranties of the End User License Agreement by various acts and omissions including, without limitation, the following:

a.   Misusing software licenses provided by MAX.

25

    b.   Falsely characterizing license sales to customers as perpetual licenses.

    c.   Tampering with and/or modifying a version of the Haptic Federal source code released in early 2023 or late 2022 to create at least five subsequent versions including 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

    d.   Retaining the Haptic Federal source code in violation of its obligation to delete that software.

    e.   Removing, altering, disabling or circumventing any copyright and trademark indications.

    f.   Replacing logos in Haptic Federal with TEG's logos.

    g.   Engaging in unauthorized and/or illegal license distribution and circumventing the license key requirement of Haptic Federal.

137.    MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the End User License Agreement.

138.    As a direct and proximate result of TEG's breach of the End User License Agreement, MAX has been damaged in an amount to be proven at trial.

139.    MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

<u>COUNT III</u>
**(Breach of Contract – Joint Venture Agreement)**

140.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

141.    MAX entered into a Joint Venture Agreement in connection with its business relationship with TEG. The Joint Venture Agreement constitutes a valid and enforceable contract.

142.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Joint Venture Agreement by various acts and omissions including, without limitation, the following:

a.  Failing to meet revenue targets, paid to MAX, in 2021, 2022, and 2023.

b.  Failing to create a distribution channel for Haptic Federal to the federal government.

c.  Failing to deliver, deploy, sustain and develop customer requirements.

d.  Failing to maintain a web presence for marketing material of the Haptic Federal product.

e.  Providing discounts and failing to subtract the discount amount from TEG's share of revenue.

f.  Providing support to customers that had not renewed licenses and retaining all of that revenue.

g.  Failing to give MAX personnel access to TEG's commercial data center.

h.  Failing to share an electronic files system.

i.  Failing to work collaboratively with MAX on the preparation and delivery of proposals, marketing materials, and activity reporting to government customers.

j.  Engaging in unauthorized and/or illegal license distribution.

k.  Misusing licenses of Haptic Federal and circumventing the license key requirement of Haptic Federal.

143.    MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the Joint Venture Agreement.

144.    As a direct and proximate result of TEG's breach of the Joint Venture Agreement, MAX has been damaged in an amount to be proven at trial.

145.    MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

## COUNT IV
### (Breach of Contract – Certification Agreement)

146.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

147.    MAX entered into a Certification Agreement in connection with its business relationship with TEG. The Certification Agreement constitutes a valid and enforceable contract.

148.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Certification Agreement with respect to the source code transfers for Haptic Federal versions 3.1.21.8 and 3.1.21.9 by, among other things, retaining the source code, withholding the government scan report, withholding Chain of Custody documents, and failing to obtain signatures from everyone who touched the code.

149.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Certification Agreement by tampering with and/or modifying a version of the Haptic Federal source code released in early 2023 or late 2022 to create at least five subsequent versions including 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

150.    MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the Certification Agreement.

151.    As a direct and proximate result of TEG's breach of the Certification Agreement, MAX has been damaged in an amount to be proven at trial.

<u>**COUNT V**</u>
**(Copyright Infringement – Unauthorized Copying)**

152.     MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

153.     MAX is the sole owner of all versions of the Haptic Federal source code.

154.     The Haptic Federal source code is a "computer program" within the meaning of 17 U.S.C. § 101 and constitutes copyrightable subject matter within the meaning of 17 U.S.C. § 102.

155.     MAX has secured the exclusive rights and privileges in and to the copyright for the Haptic Federal source code by filing registrations for this software with the United States Copyright Office, as evidenced by the Certificates of Copyright Registration Nos. [...], [...], and [...] from the Register of Copyrights in the United States Copyright Office. A copy of these Certificates of Copyright Registration is attached hereto as Exhibit XX and incorporated herein by reference.

156.     TEG has had access to the source code for Haptic Federal on numerous occasions. MAX first provided TEG with a copy of the source code in June 2020 and TEG has been provided numerous additional versions of that source code including, most recently, version 3.1.21.9 of the Haptic Federal source code in September 2023 in accordance with the Certification Agreement.

157.     TEG used and copied a version of the Haptic Federal source code to create one or more modified versions that were then copied without authorization of MAX knowing such use and copying to be unlawful.

158.     TEG's unauthorized use and copying of the Haptic Federal source code, and creation of one or more derivative works therefrom, constitutes direct violations of the exclusive rights conferred on MAX under the Copyright Statute, 17 U.S.C. 100, et seq. entitling MAX to a

judgement finding TEG to have infringed MAX's copyrights and to have that infringement found to be willful.

159.    TEG's actions being knowingly in violation of MAX's rights, MAX is entitled to an award of its actual damages as well as TEG's profits resulting from TEG's unauthorized use and copying of the Haptic Federal source code and the creation of unauthorized derivative works thereof, in an amount to be proved at trial, or an award of statutory damages for TEG's willful infringement.

160.    MAX is further entitled to injunctive relief to prevent further infringement of MAX's copyrights by TEG and to an order requiring the destruction of all copies of the Haptic Federal software in TEG's possession as well as the destruction of all derivative works created therefrom.

161.    MAX is further entitled to recover costs, including reasonable attorneys' fees, that it has incurred as a result of TEG's willful infringement of MAX's copyright interests.

## <u>COUNT VI</u>
### (Circumvention of copyright protection systems under 17 U.S.C. §1201(a)(1))

162.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

163.    TEG's modification of the Haptic Federal source code and backdating of computers to bypass the license key requirement circumvent the technological measures put in place by MAX to protect that source code and are therefore a violation of 17 U.S.C. §1201(a)(1)(A).

164.    MAX is entitled to an award of its actual damages as well as TEG's profits resulting from TEG's circumvention of the technological measures put in place by MAX to protect the Haptic Federal source code, in an amount to be proved at trial, or an award of statutory damages.

165.     MAX is further entitled to injunctive relief to prevent further injury to MAX and to an order requiring the destruction of all copies of the Haptic Federal software in TEG's possession as well as the destruction of all derivative works created therefrom.

166.     MAX is further entitled to recover costs, including reasonable attorneys' fees, that it has incurred as a result of TEG's willful infringement of MAX's copyright interests.

## COUNT VII
### (Reverse Passing Off – Violation of Lanham Act 15 U.S.C. §1225(a))

167.     MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

168.     MAX has marked the Haptic Federal product with the Haptic mark by including that mark, inter alia, in the splash screen generated by the software.  The Haptic trademark is inherently distinctive for the Haptic Federal product in that it is an arbitrary term for such a software product.

169.     By altering the Haptic Federal source code to replace the Haptic trademark with TEG's C4MAP mark, TEG has falsely designated the origin of the Haptic Federal product in violation of 15 U.S.C. §1125(a) and the provisions of the End User License Agreement.

170.     By then licensing the Haptic Federal product with JVOC branding to several governmental agencies, performing installations all over the country, TEG caused the improperly marked product to enter into interstate commerce.

171.     This behavior by TEG is likely to cause confusion of consumers, namely the U.S. Government, by inducing them to believe that MAX's product originates from TEG thereby diluting the goodwill MAX has in its Haptic mark.

172.      MAX is entitled to an award of its actual damages as well as TEG's profits resulting from TEG's infringement of MAX's Haptic trademark, in an amount to be proved at trial.

31

173.    MAX is further entitled to injunctive relief to prevent further injury to MAX and to an order requiring the destruction of all copies of the Haptic Federal software in TEG's possession as well as the destruction of all derivative works created therefrom.

174.    MAX is further entitled to a finding that TEG's infringement was exceptional and thereby entitled to recover costs, including reasonable attorneys' fees, that it has incurred as a result of TEG's infringement of MAX's trademark.

**COUNT VIII**
**(Common Law Fraud)**

175.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

176.    TEG made false and material representations to MAX including, without limitation, the following:

    a.   In the years 2020, 2021, 2022, and 2023, TEG represented to MAX that there was significantly less revenue from sales of Haptic Federal than there actually was.

    b.   In the years 2020 and 2021, TEG represented to MAX that TEG was "waiting on the government" for significant amounts of revenue from sales of Haptic Federal.

    c.   In late 2022 and throughout 2023, TEG stated that MAX had never given TEG a product that works, and relatedly, TEG stated that Haptic Federal was unsellable.

    d.   In August 2023, by signing the Certification Agreement, TEG misrepresented to MAX that none of the copies of the source code they had previously received had been copied and all copies they had previously received were destroyed.

TEG, in fact, copied and is licensing a version of the source code shared to them in early 2023 or late 2022.

177.    TEG knew these representations to be false when they made them.

178.    As a result of and in reliance on TEG's misrepresentations, MAX moved forward with TEG as its business partner and continued to fulfill its obligations under the Joint Venture Agreement, Source Code License Agreement, End User License Agreement, Certification Agreement and other agreements between the parties.

179.    As a direct and proximate result of TEG's misrepresentations, MAX has been damaged in an amount to be proven at trial.

180.    MAX also seeks punitive damages for TEG's intentional misconduct, and MAX's attorneys' fees and costs, to the extent they are allowable by law or by contract.

## COUNT IX
### (Conversion)

181.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

182.    TEG intentionally exerted control over MAX's proprietary software by copying and modifying version v3.1.21.8 of the Haptic Federal source code in direct violation of the Source Code License Agreement, End User License Agreement, and Certification Agreement.

183.    TEG knows this behavior to be unauthorized as it is in direct violation of the Certification Agreement, with MAX reminding TEG of this at least twenty times.

184.    Accordingly, MAX has committed criminal conversion pursuant to Indiana Code § 35-43-4-3.

185.    MAX has suffered damage from TEG's conversion in the way of lost profits, meaning MAX is entitled to bring this civil count for three times the amount of said damages in

33

addition to reasonable attorneys' fees and other costs in accordance with Indiana Code § 34-24-3-1.

## COUNT X
### (Commercial Disparagement under Indiana Law)

186.   MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

187.   MAX made defamatory and disparaging remarks about MAX to third parties by incorrectly attributing Haptic Federal software failures to MAX when, in fact, said failures were due to inappropriate use at the direction of TEG.

188.   TEG's statements were made with malice in that TEG demonstrably knew of its falsity. TEG was aware of each version of Haptic Federal's limitations as they were set forth in the Test Plan associated with each version released. TEG's statements were calculated to degrade MAX's reputation in the marketplace and interfere with any potential business relationship between MAX and end users.

189.   Because TEG's statements were made to third parties, they are considered published.

190.   TEG's statements constitute defamation per se as they impute misconduct in MAX's trade as a software development company. In the alternative, MAX suffered damages in the form of reputational harm.

191.   Because TEG's disparaging remarks were with respect to MAX's Haptic Federal product they constitute a form of commercial disparagement.

## COUNT XI
### (Claim in the Alternative - Unjust Enrichment)

192.    MAX hereby reincorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

193.    MAX brings this Count for unjust enrichment in the alternative to its Counts for breach of contract.

194.    MAX rendered a benefit to TEG in the form of licenses and source code to the Haptic Federal software. The licenses and source code have been valuable to TEG for purposes of obtaining revenue from customers and securing multiple government contracts.

195.    MAX expected to receive payment for the benefits it provided to TEG.

196.    MAX has no remedy at law and has been damaged by TEG's unjust enrichment.

197.    It would be unjust to allow TEG to keep the millions of dollars in revenue generated and value of contracts awarded to TEG due to its access to MAX's software.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Max Minds LLC requests an order granting the following relief:

1)  Enjoining TEG and its respective agents, employees, officers, directors, servants, attorneys, and representatives from directly or indirectly, or alone or in concert with others, from any further use of MAX's proprietary information including MAX's proprietary Haptic Federal software, any derivative works thereof, and any materials authored by MAX in connection with Haptic Federal;

2)  Directing TEG and its respective agents, employees, and representatives to immediately destroy, and certify the destruction of, all of MAX's proprietary information and any and all copies thereof, including, among other things, the Haptic Federal software and any derivative works thereof;

3)   Awarding to MAX damages, including punitive damages, in an amount to be determined at trial;

4)   Attorneys' fees and costs; and

5)   Such other legal or equitable relief as the Court deems just and proper.

Date: XXX XX, 2024                        Respectfully submitted,

                                          George A. Gasper
                                          ICE MILLER LLP
                                          One American Square, Suite 2900
                                          Indianapolis, IN 46282
                                          317-236-2100
                                          george.gasper@icemiller.com

                                          Counsel for Defendant Max Minds, LLC