**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| TRIANGLE EXPERIENCE GROUP, INC. ) | |
| ) | Case No. 1:23-cv-01797-MSN-LRV |
| Plaintiff, ) | |
| ) | Honorable Judge Michael S. Nachmanoff |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| MAX MINDS, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT MAX MINDS, LLC'S REPLY IN SUPPORT OF ITS MOTION TO
DISMISS, OR ALTERNATIVELY, TO TRANSFER VENUE**

Defendant Max Minds, LLC ("MAX") respectfully submits this Reply in support of its

motion to dismiss the above captioned action (the "Action") against plaintiff Triangle Experience

Group, Inc. ("TEG") pursuant to Rule 12(b)(2) or 12(b)(3), or in the alternative, to transfer the

Action to the United States District Court for the Southern District of Indiana, Indianapolis

Division, pursuant to either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a), stating as follows:

**I.    The Forum Selection Clauses in the Parties' Agreements Apply to this Action and
There Is No Justification for Keeping the Action in Virginia.**

TEG agreed in two separate agreements to litigate the claims it is now making in Indiana

exclusively. The End User License Agreement ("EULA") and Source Code License Agreement

("SCLA") cover the subject matter of TEG's claims, and TEG cannot avoid them simply by cherry-

picking the agreements it prefers. Indeed, TEG is seeking relief that would invalidate the EULA

and SCLA, and it was entirely foreseeable that MAX will defend itself from TEG's claims by

invoking the EULA and SCLA, among other defenses and counterclaims. Realizing this, TEG

asserts that it is not subject to personal jurisdiction in Indiana, even though it submitted itself to

jurisdiction there in the EULA and SCLA. Further, TEG's own arguments why MAX is subject to personal jurisdiction in Virginia would support that TEG is subject to jurisdiction in Indiana. TEG cannot have it both ways, particularly considering that TEG (unlike MAX) consented to jurisdiction in the state at issue. TEG also relies heavily on its choice of forum carrying weight, but a plaintiff's choice of forum carries no weight when there is an applicable forum/venue selection clause, as there are two here. Finally, TEG generally ignores the real potential for inconsistent rulings if this Court does not transfer the entire Action to Indiana.

To be clear, MAX is not trying to "delay the inevitable." MAX welcomes the opportunity to present its claims to a court of law and to have the Parties' claims addressed. But the Parties agreed that these claims would be litigated elsewhere and TEG cannot change that result simply by racing to the courthouse first. For all of the reasons discussed herein, the Court must transfer this Action to Indiana as the Parties agreed.

### A. The End User License Agreement and Source Code License Agreement Relate To TEG's Claims.

As an initial matter, TEG does not dispute that the EULA and SCLA are valid and binding agreements between MAX and TEG. Further, TEG does not dispute that the EULA remains in effect. TEG does argue that the SCLA is irrelevant because it was terminated, but this ignores the survival section of the SCLA. (Pl.'s Resp. at 20-21, Dkt. 15.) Most of the SCLA provisions "survive any termination or expiration," including the provisions at issue, namely the provisions covering ownership of software (§ 7(a)), implied warranty of fitness for particular purpose (§ 8), and forum/venue selection (§ 12(f)). (Def.'s Br., Ex. C, § 11(d), Dkt. 13-3.)

As explained in MAX's opening brief and below, the EULA and SCLA cover all of TEG's claims including, crucially, Count I for half ownership of all of MAX's software.[1] Therefore, the forum/venue selection clauses in those agreements apply here. To avoid this, TEG argues in cursory fashion that "neither [the EULA or SCLA] was implicated by TEG's Complaint," which is impossible based on the nature of TEG's claims and the broad language in the forum/venue selection clauses. (Pl.'s Resp. at 19, Dkt. 15.) TEG also believes it is enough to simply plead that its "claims are brought under the [Joint Venture Agreement ('JVA')] and the [Non-Disclosure Agreement ('NDA')]."[2] However, the question is not whether TEG brought claims under the EULA or SCLA, but rather whether the language in the forum/venue selection clauses encompasses TEG's claims. *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 350 (4th Cir. 2001) ("The question before us is not whether this dispute, as to the payment for 200 video gambling machines, grows out of the Letter Agreement or the Distributor Agreement, but rather whether it is 'related to' the Distributor Agreement.").

The EULA and SCLA contain the following forum/venue selection language mandating litigation exclusively in Indiana:

- EULA: "Any action at law or in equity **arising under** this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana . . ." (Def.'s Br., Ex. B, § 9.4.2, Dkt. 13-3) (emphasis added.)

---

[1] The EULA and SCLA also cover nearly all of MAX's contemplated claims. (*See* Def.'s Br., Ex. D, Dkt. 13-4.)

[2] TEG notes that the JVA and the NDA "do not have a forum selection clause in favor of Indiana"—but the fact is those agreements have no forum selection clause at all, let alone one that is *not* in favor of Indiana. (Pl.'s Resp. at 19, Dkt. 15.)

- SCLA: "Any legal suit, action, or proceeding **arising out of or related to** this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States in Indiana or the courts of the State of Indiana located in the City of Carmel and County of Hamilton . . ." (Def.'s Br., Ex. C, § 12(f), Dkt. 13-3) (emphasis added.)

In this District, the phrases "arising under" and "arising out of or related to" are both standard broad language meaning the same thing: that all disputes related to the agreements are encompassed.  *Brenco Enterprises, Inc. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 612 (E.D. Va. 2018) ("The Agreement's 'disputes arising under' language demonstrates an intent of the parties to submit all disputes related to the Agreement to arbitration.") (citing *Peabody Holding Co., LLC v. United Mine Workers of America, Intern. Union*, 665 F.3d 96, 105 (4th Cir. 2012) (holding that an arbitration clause committing to arbitration any dispute "arising under" an agreement was a "a standard broad arbitration clause")).[3] Therefore, the issue is whether the forum/venue selection clauses "relate to" TEG's claims.

In the Fourth Circuit, a forum selection clause with "related to" language "is a 'broad' one." *Drews Distrib., Inc.*, 245 F.3d at 350. Again, the only question is whether this dispute is related to the agreement with the forum selection clause. *Id*. Here, "[i]t is immaterial" whether "the present dispute grew out of the [JVA or NDA], which contain[ ] no [forum selection] clause, if the

---

[3] Courts in this District and other jurisdictions analyze the language in arbitration clauses and forum/venue selection clauses the same way. *Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 679 n.6 (4th Cir. 2018) ("Since arbitration is, 'in effect, a specialized kind of forum-selection clause,' these principles are equally applicable to this case.") (citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 (1974)); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365-66 n.9 (4th Cir. 2012); *cf. Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) ("We cannot imagine why the scope of that phrase [referring to an arbitration clause] would differ for purposes of a forum-selection clause."). Therefore, cases cited herein involving arbitration clauses are applicable.

dispute also 'relates to' the [EULA or SCLA]." *Id*. In other words, it doesn't matter how TEG labels its claims, the only question is whether the content of its claims relate to the EULA or SCLA. *Id*. ("Examination of the factual allegations of the complaint compels the conclusion that the instant dispute is, in fact, 'related to' the Distributor Agreement. . . . Although the complaint carefully alleges only fraud in inducing Drews to enter into the Letter Agreement (and not the Distributor Agreement) . . ."); *see also Branchville Mach. Co. v. Agco Corp.*, 252 F. Supp. 2d 307, 311 (E.D. Va. 2003) ("The clause in the instant agreement, then, by its own terms, reaches beyond the Financing Agreement itself to cover disputes arising from all aspects of the parties' relationship.").

Courts across the country agree with the Fourth Circuit that broad forum selection clauses (like the ones here) apply when the claims relate to the agreement containing the forum selection clause, and the analysis does not depend on whether the claims were brought pursuant to the same contract. *E.g.*, *Computer Scis. Corp. v. Cognizant Tech. Sols. U.S. Corp.*, No. 315CV00267HDMVPC, 2015 WL 7312884, at *2 (D. Nev. Nov. 18, 2015) (transferring case to the Eastern District of Virginia because "[a]ll of CSC's claims—those based on the non-solicitation/non-compete agreements, those based on the stock option award agreements, and those arising purely in tort—relate to Maguire's employment and termination and thus arise out of or relate to the letter agreement."); *Auto-Owners Ins. Co. v. Pletcher*, No. 3:18-CV-949 JD, 2019 WL 1930231, at *2 (N.D. Ind. May 1, 2019) (compelling arbitration where arbitration clause included phrase "arising out of," which "reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract."); *Silgan White Cap Americas LLC v. Alcoa Closure Sys. Int'l, Inc.*, No. 1:07-CV-1536-LJM-JMS, 2008 WL 11511502, at *3 (S.D. Ind. July 3, 2008) (granting motion to transfer where the facts surrounding

the "claims are the same as those that would give rise to an indemnification action on the Agreement[,] and [t]hus, the claims . . . are sufficiently related to the indemnification clause to be said to arise from or be related to it.") (citations omitted).

Additionally, other courts have found that forum selection clauses apply when the defendant relies on the contract containing the forum selection clause as a defense to plaintiff's claims, even though plaintiff's claims were not brought pursuant to that contract. *See, e.g.*, *Penn, LLC v. New Edge Network, Inc.,* No. 03-C-5496, 2003 WL 22284207, at *2 (N.D. Ill. Oct. 3, 2003) ("If enforcement of a provision in the service agreement is clearly a defense to [plaintiff's tort] claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause."); *see also Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.,* 949 F. Supp. 1427, 1433-1434 (N.D. Cal. 1997) (finding that where the defendants' defense to the plaintiff's copyright infringement claim involved interpretation of an underlying contract containing a forum selection clause, the plaintiff's claims fell within the scope of that clause).

Under the foregoing standards, each of TEG's claims relates to the EULA and SCLA. Count I of TEG's Complaint "requests that the Court declare the software [referring to 'Haptic, Haptic Federal, Haptic Commercial or Alleo'], and all versions of it, is owned by TEG and Max Minds on a 50/50 basis."[4] (Compl., ¶ 65, Dkt. 1.) This plainly relates to the ownership provisions of the EULA and SCLA in which TEG acknowledges MAX owns Haptic and Haptic Federal. (Def.'s Br., Ex. B, § 5, Dkt. 13-2; Def.'s Br., Ex. C, § 7(a), Dkt. 13-3.) TEG's argument that Count

---

[4] TEG asserts in its Response brief that all its "claims are brought under the JVA and the NDA," (Pl.'s Resp. at 19, Dkt. 15), but Count I for Declaratory Judgment is not brought pursuant to any agreement. (Compl., ¶¶ 63-65, Dkt. 1.) It does not matter whether TEG brought Count I pursuant to the JVA to determine whether it relates to the EULA or SCLA. Still, "a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Campbell ex rel. Equity Units Holders v. American International Group Inc.,* 86 F. Supp.3d 464, 472 n.9 (E.D. Va. 2015).

I is confined to dealing with the JVA is severely misguided. First, the JVA does not address ownership, while the EULA and SCLA do. Second, Count I asks for ownership of products that are not even mentioned in the JVA, namely, Haptic, Haptic Commercial, and Alleo.[5] By contrast, the EULA addresses ownership of Haptic and Haptic Federal and the SCLA addresses ownership of Haptic Federal. Third, the SCLA "supersedes all prior and contemporaneous [agreements] with respect to [the subject matter of the SCLA,]" including the JVA. (Def.'s Br., Ex. C, § 12(a), Dkt 13-3.) For these reasons, MAX will rely on the EULA and SCLA as defenses against Count I. Beyond that, ruling in TEG's favor on Count I would invalidate the EULA and SCLA. Undoubtedly, Count I relates to the EULA and SCLA.

Count II alleges that "Max Minds breached the JV Agreement by failing to create and maintain a functioning source code."[6] (Compl., ¶ 65, Dkt. 1.) This count is related to the SCLA by which MAX agreed to grant TEG "license during the Term to use the Source Code for the Software" and MAX obligated itself to "deliver the Source Code and Documentation [ ] to TEG[.]" (Def.'s Br., Ex. C, §§ 2(a), 2(d), 12(f), Dkt. 13-3.) The SCLA disclaims any warranties as to the product's functionality and MAX will rely on the SCLA for its defense against Count II. (Def.'s Br., Ex. C, § 8, Dkt. 13-3.) The EULA contains a similar disclaimer that MAX will use as a defense. (Def.'s Br., Ex. B, § 5, Dkt. 13-2.) For these reasons, Count II relates to the EULA and SCLA.

Count III alleges that "Max Minds breached the implied warranty of fitness for a particular purpose[.]" (Compl., ¶ 70, Dkt. 1.) The EULA and SCLA both disclaim liability from potential breach of the implied warranty of fitness for a particular purpose. (Def.'s Br., Ex. B, § 5, Dkt. 13-

---

[5] Haptic is now called "Alleo." MAX does not use the name "Haptic Commercial."

[6] In an example of TEG playing fast and loose with terms, TEG inserted the word "functioning" in Count II, despite the fact that the JVA does not contain that word. The JVA merely states that "Retainer payments will be used by MAX for the following: Create and maintain a branch of the Haptic source code, called Haptic Federal; . . ." (Compl., Ex. 1, at 1, Dkt. 1.)

2; Def.'s Br., Ex. C, § 8, Dkt. 13-3.) MAX intends to rely on the disclaimers in the EULA and SCLA for two of its defenses to Count III of TEG's complaint. Beyond that, ruling in TEG's favor on Count III would invalidate the EULA and SCLA. Therefore, this count relates to the EULA and SCLA. Notably, the JVA does not mention warranty.

Count IV alleges that MAX failed to share licensing revenue pursuant to the JVA. This count is predicated on TEG's allegation in Count I that it owns half of MAX's software. As with Count I, MAX's defense of Count IV will involve the ownership provisions of the EULA and SCLA, among other things. Therefore, this count relates to the EULA and SCLA.

Count V alleges that MAX failed its obligations under the Parties' NDA to keep TEG's confidential information from third parties. While TEG's allegations are vague, the alleged confidential information at issue seems to be information that MAX used to create the code for its software products. (See Compl., ¶ 28, Dkt. 1.) MAX intends to argue, among other defenses, that it did not use any of TEG's confidential information to create Haptic or Haptic Federal. As stated in the SCLA, "Licensor [MAX] has developed the Software[.]" (Def.'s Br., Ex. C at 1, Dkt. 13-3.) And again, TEG acknowledged in both the SCLA and the EULA that MAX owns the code at issue. Therefore, this count relates to the SCLA and EULA.

The primary case TEG relies upon, *LIOBMedia, LLC v. Dataflow/Alaska, Inc.*, 1:07CV355, 2007 WL 2109279 (E.D. Va. July 16, 2007), is distinguishable. First, in *LIOBMedia*, the contract with the forum selection clause was a non-disclosure agreement whose subject matter was irrelevant to the plaintiff's claims. Here, the EULA and SCLA overlap entirely with TEG's claims. The EULA states that "[a]ll title, ownership rights and intellectual property rights in and to the Product [Haptic] . . . are owned by [Max Minds, LLC dba] HAPTIC or its licensors[.]" (Def.'s Br., Ex. B, § 2.) Likewise, TEG acknowledged in the SCLA that "[MAX] has developed

the Software [Haptic Federal]" and "that, as between [TEG and MAX], MAX owns all rights, title, and interests, including all intellectual property rights, in and to the [Haptic Federal] Software, Source Code and Documentation."[7] (Def.'s Br., Ex. C, at 1; *id.* at § 7(a).) These agreements underscore a fundamental point: TEG needed to license the software from MAX because MAX developed and owned the software. If TEG owns the software "50/50", as TEG's Count I claims, why would TEG need licensing agreements with MAX?

Second, *LIOBMedia* is distinguishable because there were no allegations for breach of the non-disclosure agreement, whereas MAX intends to raise defenses and/or bring claims for breach of the EULA and SCLA. (Def.'s Br., Ex. D, Dkt. 13-4.) Third, in *LIOBMedia*, the non-disclosure agreement was merely incorporated into the Teaming Agreement pursuant to which plaintiff sued. Here, the SCLA *supersedes* the JVA (or any other agreement) with respect to the subject matter of the SCLA. (Def.'s Br., Ex. C, § 12(a), Dkt. 13-3.) Fourth, the forum selection language in the SCLA ("related to") is broader than in the non-disclosure agreement in *LIOBMedia* ("concerning the subject matter hereof"). Finally, the Teaming Agreement in *LIOBMedia* had a forum selection clause (albeit a non-specific one), whereas the JVA and NDA in this case do not.[8]

**B. TEG Is Subject to Personal Jurisdiction in Indiana for This Action.**

Given that TEG's claims relate to the EULA and SCLA, TEG is subject to personal jurisdiction in Indiana. TEG agreed that for any action or matter related to the EULA or SCLA, it would submit itself to the personal and exclusive jurisdiction of Indiana:

---

[7] The duration of the SCLA is irrelevant to TEG's acknowledgements that MAX developed and owns the software.

[8] TEG incorrectly states, "the teaming agreement did not contain a forum selection clause." (Pl.'s Resp. at 19, Dkt. 15), but "[t]he Teaming Agreement [had ] its own forum selection clause allowing the case to proceed in this Court." *LIOBMedia, LLC*, No. 1:07CV355, 2007 WL 2109279, at *2.

- EULA: "Any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana and **the parties hereto hereby submit generally and unconditionally to the personal and exclusive jurisdiction and venue of these courts in respect to any such matter** and consent to service of process by any means authorized by Indiana law." (Def.'s Br., Ex. B, § 9.4.2, Dkt. 13-3) (emphasis added).

- SCLA: "Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States in Indiana or the courts of the State of Indiana located in the City of Carmel and County of Hamilton, and **each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding**." (Def.'s Br., Ex. C, § 12(f), Dkt. 13-3) (emphasis added).

As demonstrated above, TEG's claims are inextricably intertwined with the EULA and SCLA. TEG certainly anticipated this (or should have), and therefore TEG should reasonably anticipate being haled into court in Indiana where those agreements mandate disputes be adjudicated. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 (4th Cir. 2009) ("a valid forum selection clause . . . may act as a waiver to objections to personal jurisdiction").

An additional and independent basis for Indiana having personal jurisdiction over TEG is that TEG's actions reached into Indiana to partner with MAX. TEG reached out to Mr. Fischer in 2018 (not the other way around) to solicit a partnership. (Fischer Decl., ¶ 7, Dkt. 13-1); s*ee* Second Declaration of Brandon Fischer ("2d Fischer Decl."), attached herewith as **Exhibit A**, Ex. 1. TEG's CEO Rob Clare offered to go to Indiana to discuss their potential partnership in November 2019

and reached out to MAX again January 2020 in pursuit of a JVA with MAX. 2d Fischer Decl., Ex. 3-4. TEG's employees communicated with MAX's employees in Indiana for nearly four years, as TEG acknowledges. TEG licensed software that TEG knew was developed by an Indiana company. And as TEG stated, it sent "no less than $5,000,000" to MAX, an Indiana company, in furtherance of a partnership with that Indiana company.

### C.  Public Interest Factors Weigh in Favor of Transferring the Case to Indiana.

MAX noted in its opening brief that keeping the Action in Virginia would create judicial inefficiency and risk inconsistent rulings. As detailed in MAX's draft complaint, MAX has numerous causes of action against TEG, nearly all of which are related to the EULA and/or the SCLA because they are either counts for breach of contract or counts based on MAX's rightful ownership of its software. (*See* Def.'s Br., Ex. D, Dkt. 13-4.) More specifically, MAX has causes of action against TEG based upon TEG's breaches of four separate agreements (the SCLA, the EULA, the JVA, and a Certification Agreement) that occurred at various points throughout the Parties' nearly four year relationship. (*Id*. at ¶¶ 128-151.) MAX also has causes of action against TEG due to TEG's past *and ongoing* violations of MAX's intellectual property rights under copyright and trademark law, (*id*. at ¶¶ 152-174), as well as claims against TEG for its numerous fraudulent misrepresentations, conversion of software source code, commercial disparagement, and unjust enrichment. (*id*. at ¶¶ 175-197.) TEG's complaint alleges that MAX is the party that failed to perform throughout the duration of their relationship, but MAX intends to prove that TEG is the one that breached the JVA, among the other agreements governing the Parties' relationship, and TEG committed serious violations of intellectual property law and common law torts against MAX. All of MAX's claims are inextricably intertwined with TEG's claims. While TEG was supposed to act as MAX's good faith distributor of Haptic Federal software to federal government

customers, TEG enacted a years-long effort to steal ownership of MAX's software and claim it as TEG's own, culminating in this lawsuit.

Any claim related to the EULA or SCLA cannot be raised in this Court, even as a compulsory counterclaim, and MAX would bring those claims in Indiana. *Kenray, Inc. v. Judson Atkinson Candies, Inc.*, No. NA 02-132-C BH, 2002 WL 2012439, at *3 (S.D. Ind. Aug. 28, 2002) ("A party to a forum selection clause may not raise in a different forum, even as a compulsory counterclaim, a dispute within the scope of that clause.") (citing *Publicis Communication v. True North Communications, Inc.,* 132 F.3d 363, 365-66 (7th Cir. 1997)). Thus, keeping this case in Virginia would result in two lawsuits in two separate courts over the same facts and legal issues, thereby creating judicial inefficiency and the risk of inconsistent rulings.

Moreover, the crux of TEG's complaint is Count I that addresses ownership of all of MAX's software products. This claim must be litigated in Indiana pursuant to the EULA and SCLA. Therefore, even if the Court determines that other claims in TEG's complaint are not subject to the forum/venue selection clauses of the EULA and SCLA, the entire complaint should be transferred, along with the issue of ownership that is the central issue in this case. *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824, 828 n.1 (E.D. Va. 2004) ("[S]everance would be inappropriate because the issue of Global's negligence is central to the amended complaint, counterclaims, third-party claims, and cross-claim."). TEG ignores this point.

TEG does not address the real concerns of inefficiency and inconsistent rulings, except to say that MAX's claims in Indiana "would likely be subject to transfer back to this Court pursuant to the First-To-File Rule[.]" (Def.'s Resp. at 19 n.1, Dkt. 15.) Seventh Circuit precedent actually shows the opposite. In *United Consumers Club, Inc. v. Prime Time Marketing Management Inc.*, 2008 WL 150623 (N.D. Ind. 2008), Prime Time initiated an action in Ohio with causes of action

related to a franchise agreement. *Id*. at *1. Subsequently, DirectBuy (f/k/a United Consumers Club) filed a complaint in the Northern District of Indiana alleging, among other things, breach of the franchise agreement. *Id*. The franchise agreement contained a forum selection clause that mandated DirectBuy bring any action in Lake County, Indiana (or Cook County, Illinois).[9] *Id*. at *4. Prime Time moved for transfer of the case to the Southern District of Ohio.[10] *Id*. at *2. The Court noted that the issue of "which cause of action was first-filed largely is irrelevant." *Id*. at *3. One reason the Court provided that the first-to-file rule was irrelevant is "the presence of a forum selection clause in the franchise agreement." The Court stated that "[c]onsideration of this clause is an important factor in considering Prime Time's arguments in support of its motion to transfer venue pursuant to 28 U.S.C. § 1404(a)[,]" but "it is not the sole consideration." *Id*. at *4. After considering the § 1404(a) factors, the Court held that "[i]n light of the Supreme Court's admonition that a valid forum selection clause occupy a central figure in this analysis, there is no basis under which to transfer this case."[11] *Id*. at *6. As applicable here, it is highly unlikely the Southern District of Indiana would transfer any claims to this Court that are encompassed by the forum/venue selection clauses in the EULA and SCLA. This is especially true since MAX's Indiana Complaint seeks injunctive relief. *See also Research Automation, Inc. v. Schrader-Bridgeport Intern., Inc.,* 626 F.3d 973, 980 (7th Cir. 2010) (holding "where the parallel cases involve a declaratory judgment action and a mirror-image action seeking coercive relief—we

---

[9] The Court did not need to decide whether the forum selection clause in the franchise agreement affected the Ohio proceeding instituted by Prime Time. *United Consumers Club, Inc.*, No. 2:07CV358, 2008 WL 150623, at *4.

[10] Prime Time also moved to dismiss under FRCP 13(a). *Id*. at *2.

[11] Since the opinion in *United Consumers Club, Inc. v. Prime Time Marketing Management Inc.*, the Supreme Court has bolstered the centrality of a forum selection clause to the § 1404(a) analysis. *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western District of Texas*, 571 U.S. 49, 64 (2013) ("forum selection clauses should control except in unusual cases").

ordinarily give priority to the coercive action, regardless of which case was filed first. In those cases, we have repeatedly taught that this circuit does not rigidly adhere to a first-to-file rule.").

In their opposition brief TEG states "[t]he Court may consider the plaintiff's choice of venue" as a factor in the § 1404(a) analysis. (Def.'s Resp. at 18, Dkt. 15.) The presence of a valid forum selection clause in the present case makes this assertion erroneous. In *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. Of Texas*, 571 U.S. 49, 63 (2013), the Supreme Court stated that in "[t]he presence of a valid forum-selection clause . . . the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." Accordingly, the forum selection clauses contained in the SCLA and EULA not only make TEG's choice of venue irrelevant, but shift the burden to TEG to show why those clauses should not be enforced.

## II.   Rule 12(b)(2) Warrants Dismissal Because There Is No Personal Jurisdiction Over MAX.

TEG has failed to meet its burden of proof to show that MAX is subject to the personal jurisdiction of this Court. Specifically, TEG fails "to demonstrate (1) that [MAX] purposefully availed itself of the privilege of conducting activities in Virginia; (2) that [TEG's] claims arose out of the activities that [MAX] directed at Virginia; and (3) that the district court's exercise of personal jurisdiction over [MAX] would be constitutionally reasonable." *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198 (4th Cir. 2018).

### A.   TEG Has Not Shown That MAX Purposefully Availed Itself of the Privilege of Conducting Business in Virginia.

In its opposition, TEG fails to specifically satisfy any of the established purposeful availment factors including "(1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into

the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted." *Id* at 198-99.

TEG points to three meetings in Virginia that led to the signing of the JVA in January 2020, including the "(i) July meeting in Suffolk, Virginia, (ii) November meeting in Chantilly, Virginia, and (iii) January meeting in Ashland, Virginia." (Def.'s Resp. at 11, Dkt. 15.) However, in all three instances TEG was the party that initiated the meeting. *See* 2d Fischer Decl., Ex. 1-4. In July 2019 Mr. Fischer reached out to TEG to inquire if they would like to be one of several potential partners to meet with MAX and view the Haptic product. 2d Fischer Decl., Ex. 2. TEG declined to attend Mr. Fischer's event but, instead, invited Mr. Fischer to the U.S. Government Joint Staff Lab (not TEG's facility) in Suffolk to demo Haptic for their contacts in the Department of Defense. *Id.*; (Fischer Decl., ¶ 8, Dkt. 13-1.) On November 2, 2019, TEG CEO Rob Clare emailed Mr. Fischer stating "I hate to ambush you with this, curious if you are open to me coming out to IN. I feel like we can get further down the road if you and I spend an hour or so white-boarding how best to move forward." 2d Fischer Decl., Ex. 3. After some back and forth the parties decided to host the meeting in Chantilly. Finally, the January 2020 meeting in Ashland was the result of an invitation, which Mr. Clare extended to Mr. Fischer by phone, for the purpose of signing the JVA in person. Following Mr. Clare's phone call, Mr. Fischer sent a follow-up email finalizing logistics. 2d Fischer Decl., Ex. 4. After the JVA was signed, MAX and TEG would have frequent meetings regarding performance. However, TEG's main participants in these calls were not located in

Virginia. (Fischer Decl., ¶ 15, Dkt. 13-1.) Further, MAX's software was not hosted on the TEG data center in Ashland as the "data center" is simply a computer on a private network. Instead, demos of the software by TEG to potential customers were hosted on MAX's cloud, which is not located in Virginia.

In *Medmarc Casualty Insurance Company v. GD Group USA Company*, 669 F.Supp.3d 555 (E.D. Va. 2023) the plaintiff was defendant's insurer. Defendant acquired the insurance policy through plaintiff's Virginia unit and after the defendant had reached out to a Virginia-based insurance broker. *Id*. at 563. The court in Virginia held that it did not have personal jurisdiction over the defendant noting, "[i]n *Walden v. Fiore*, the Supreme Court made clear that the mere presence and activities of a plaintiff in the forum state cannot create personal jurisdiction over the defendant. 571 U.S. 277, 283 (2014) . . . *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 200 (4th Cir. 2018) (favorably citing *Moncrief Oil International, Inc. v. OAO Gazprom*, 481 F.3d 309, 312-13 (5th Cir. 2007), 'where the Fifth Circuit found that a decision to contract with a resident of the forum state did not establish personal jurisdiction, even though the resident foreseeably performed many of its duties there, in part because the contract was centered outside the forum and did not require performance in the forum by the defendant')." *Medmarc Cas. Ins. Co.*, 669 F.Supp.3d at 565.

In *Medmarc*, performance of the insurance policy was not centered around Virginia. Therefore, for a claim pursuant to that policy, the court did not have personal jurisdiction over the defendant. It did not matter that the policy was negotiated and entered in Virginia nor the fact that plaintiff performed some activities in Virginia. Here, none of MAX's operations or employees are located in Virginia. Even the majority of TEG employees who are involved in performance of the JVA do not work from, or live in, Virginia. (Fischer Decl., ¶ 15, Dkt. 13-1.) The JVA's strongest

16

connection to Virginia is the fact that TEG's CEO Rob Clare is a resident and Mr. Fischer communicated with him to negotiate the JVA. "However, these communications were, at most, fortuitous contacts with Virginia, dictated by where [TEG] happened to be located rather than a purposeful availment by [MAX] of the benefits of doing business in Virginia." *Medmarc Cas. Ins. Co.*, 669 F.Supp.3d at 565.

Further, TEG does not dispute or present any evidence to refute the fact: (1) MAX maintains no offices or agents in Virginia, (2) MAX does not maintain property in Virginia, and (3) MAX is not party to any choice of law clause which selects the laws of Virginia. According to the guidance of *Medmarc* and the Fourth Circuit, MAX has not purposefully availed itself of the benefit of doing business in Virginia. Therefore, TEG has failed to meet its burden to show that this Court has personal jurisdiction over MAX.

### B. TEG Has Not Shown That Its Claims Arose Out of Activity MAX Directed at Virginia.

In its Response brief, TEG states "TEG's claims in the Complaint arise exclusively out of Max Minds' breach of the JVA and the obligations contained therein." (Def.'s Resp. at 13, Dkt. 15.) However, TEG has failed to show how MAX's performance and alleged breach of the JVA are tied to Virginia. As stated above, the small amount of contact MAX had with Virginia during the negotiation of the JVA is not sufficient. "And lower federal courts have consistently held that the mere creation of a contract with a Virginia resident is insufficient to pass Due Process muster, especially where the contract itself does not require performance in the forum state." *Medmarc Cas. Ins. Co.*, 669 F.Supp.3d at 365 (citing *Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 480-81 (E.D. Va. 1997) (finding that the existence of several contracts between the Virginia plaintiff and the foreign defendant were insufficient to establish jurisdiction over the defendant in

Virginia, even where the contracts contained Virginia choice of law provisions, where the contracts did not indicate that performance was to occur in Virginia)).

TEG has failed to present any caselaw that states the negotiation of an agreement partially taking place in Virginia, in and of itself, is sufficient to give rise to personal jurisdiction. TEG has further failed to show how MAX's conduct resulting in the alleged breach of the JVA arose out of activity MAX directed at Virginia. Accordingly, TEG has failed to meet its burden to show that this Court has personal jurisdiction over MAX.

### C. TEG Has Not Shown That the Court's Personal Jurisdiction Over MAX Would Be Constitutionally Reasonable.

In its Response brief TEG makes the conclusory and incorrect statements that "Max Minds repeatedly traveled to Virginia to establish a business venture with TEG," "consistently reached into the Commonwealth to transact business with it, and Virginia plainly has a substantial interest in resolving this dispute." (Def.'s Resp. at 14, Dkt. 15.) As outlined above, all of MAX's travel to Virginia in connection with the JVA was at the behest of TEG, and MAX has not "consistently reached into the Commonwealth to transact business with it." Further, TEG alleges no facts showing "Virginia plainly has a substantial interest in resolving this dispute."

Considering none of MAX's employees or operations are based in Virginia, it would be burdensome for MAX to litigate this action in Virginia. Further, because the performance of the JVA is not centered in Virginia, it is difficult to see how Virginia has any interest in resolving this dispute. Finally, TEG's interest in obtaining relief would not be prejudiced as it would have the opportunity to litigate in the forum to which it previously assented. Accordingly, TEG has failed to meet its burden to show that this court's personal jurisdiction over MAX would be constitutionally reasonable.

In light of the foregoing, TEG has failed to meet its burden of showing that this Court has personal jurisdiction over MAX. As a consequence of TEG's failure, this Court cannot submit MAX to its jurisdiction, and this Action must be dismissed under Federal Rule of Civil Procedure 12(b)(2) or transferred under 28 U.S.C. § 1406(a).

### III.    Virginia Is an Improper Venue in Which to Adjudicate This Action.

Under 28 U.S.C. § 1391(b) "A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." Further, "[t]he plaintiff bears the burden of establishing that venue is proper." *Yancey v. Int'l Fid. Ins. Co.*, No. 1:16-CV-0057, 2016 WL 2997375, at *2 (E.D. Va. May 25, 2016).

TEG attempts to quickly dispose of MAX's improper venue argument by stating, "because the Court should find that Max Minds is subject to this Court's personal jurisdiction, venue is proper pursuant to 28 U.S.C. §1391(b)(1)." (Def.'s Resp. at 15, Dkt. 15.) It is true that residency, for the purposes of venue, can be shown via personal jurisdiction over the defendants. However, for reasons outlined above, TEG has failed to establish that this Court has personal jurisdiction over MAX. Further, because MAX does not have any offices in, nor has any employees who work from Virginia, it cannot be shown that MAX is a "resident" of Virginia for venue purposes.

In the alternative, TEG argues that "venue is proper in this Court because a substantial part of the events giving rise to TEG's claim arose here." (*Id*.) However, the performance of the JVA underlying TEG's claims minimally touches Virginia. With respect to MAX, all of their facilities

and employees are located outside of Virginia and have performed their duties under the JVA outside of Virginia. It is true that the JVA was partially negotiated and signed in Virginia. However, TEG's claim that "communications exchanged between the parties came through TEG's offices in Virginia" is misleading at best. (Def.'s Resp. at 15, Dkt. 15.) The majority of TEG employees with whom MAX communicated were located in states other than Virginia. (Fischer Decl., ¶ 15, Dkt. 13-1.) Rob Clare and his wife Janna are the only TEG employees who live in Virginia and engaged with MAX semi-regularly. (*Id*.) It is clear that the "communications" TEG references are tied to Virginia only in the sense that Virginia is where TEG's offices are located. The persons involved in the communications were largely located outside of Virginia. TEG further relies on their own activity to support a finding of proper venue. However, because the vast majority of TEG employees with whom MAX worked regularly reside in other states, this reliance is misplaced.

Accordingly, TEG has failed in its burden to show that this court is a proper venue to hear this action. Therefore, this action must be dismissed under Federal Rule of Civil Procedure 12(b)(3) or transferred in accordance with 28 U.S.C. § 1406(a).

## CONCLUSION

For all these reasons, Defendant Max Minds, LLC respectfully requests that this Court grant its motion and either dismiss this Action pursuant to Rule 12(b)(2) or Rule 12(b)(3) or transfer it in its entirety to the Southern District of Indiana, Indianapolis Division, pursuant to either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a) and grant such further relief as this Court may find just, proper, and equitable.

Date: March 25, 2024

Respectfully submitted,

/s/ Timothy D. Belevetz
Timothy D. Belevetz (VSB No. 36110)
ICE MILLER LLP
200 Massachusetts Avenue, N.W., Suite 400
Washington, DC  20001
202-572-1605
timothy.belevetz@icemiller.com

George A. Gasper (admitted *pro hac vice*)
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282
317-236-2100
george.gasper@icemiller.com

Counsel for Defendant Max Minds, LLC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 25th day of March, 2024, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which sends a notification of such filing to all counsel of record.

/s/ Timothy D. Belevetz
Timothy D. Belevetz
ICE MILLER LLP
200 Massachusetts Avenue, N.W., Suite 400
Washington, DC  20001
202-572-1605
timothy.belevetz@icemiller.com
